567 A.2d 463

Cecil M. BENADOM, Trustee, et al.

v.

Henry Curtis COLBY, Jr., et al.

No. 632, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Dec. 27, 1989.

Melvin J. Sykes, Baltimore (William B. Warren and Dewey, Ballantine, Bushby, Palmer & Wood, New York City, on the brief), for appellants.

W. Shepherdson Abell (Dorothy W. Lorenz and Furey, Doolan & Abell, on the brief), Chevy Chase, for appellees, Hudson, III, et al.

A. MacDonough Plant (Kristine K. Howanski and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellees, Minor, Unborn and Unknown Persons. Estelle A. Fishbein and Frederick G. Savage, on the brief, Baltimore, for Johns Hopkins University.

C. Van Leuven Stewart, Marianne Schmitt Hellauer, Cathy A. Chester and Venable, Baetjer and Howard on the brief, Baltimore, for appellee, Hood College, St. John's College and Washington College.

Albert S. Barr, III, on the brief, Baltimore, for appellees, Descendants of Mary King Hodson Brown.

Arthur P. Caltrider, Baltimore, on the brief, for appellees.

Argued before ROSALYN B. BELL, KARWACKI and CATHELL, JJ.

ROSALYN B. BELL, Judge.

This appeal and cross-appeal followed a decision rendered by the Circuit Court for Baltimore City. The case involves the construction of a portion of a trust, known as the Hodson Trust, and the deference due to the Trustees' interpretation of those sections of that Trust. The Trustees [1] brought the action against 68 named defendants [2] and all minors, known and unknown, born and unborn (the Minors), who might have an interest in the income referred to in the Trust provisions at issue. The widow of Thomas Hodson III (Thomas III) and sole distributee of his estate intervened as a defendant with the consent of the other parties.

In 1976, after the death of Thomas III, a grandson of the settlor, the Trustees determined that the five percent income referred to in § 14(e) "reverted" to the Trust and became available for distribution to four colleges.[3] Appellees/cross-appellants (these various parties will be described later) did not believe this was a correct determination. Hence, the Trustees sought a judicial construction of certain clauses in the Trust, confirming their interpretation which they contended was appropriate under the Trust. The trial court agreed with the Hodson III,[4] as well as the

---

1. Cecil M. Benadom, the first named appellant in this case, is one of the seven named Trustees.

2. Henry Curtis Colby, Jr., the first named appellee in this action, is one of the 68 named defendants.

3. They are: The Johns Hopkins University, Hood College, St. John's College and Washington College.

4. They are: Leasa Ann Hodson Cooper, Irene Lee Hodson Kerr, Thomas Sherwood Hodson IV, Katrina Sims Hodson Courtney, and Bette O. Hodson (widow of Thomas III), the heirs of Thomas III.

Minors and the descendants of Mary King Hodson Brown,[5] appellees/cross-appellants, that the Trustees' interpretation was incorrect, and concluded that the income should be distributed to the widow of Thomas III, Bette O. Hodson, with payments to have commenced as of September 1, 1985.[6]

In this appeal, the Trustees and the college cross-appellants contend:

—The court erred in construing § 14(e) of the Hodson Trust as meaning that the income referred to in that section did not revert to the Trust on Thomas III's death, but vested in Thomas III absolutely and continues for the life of the Trust in Thomas III's widow and her successors in interest.

—The court erred in rejecting the Trustees' contention that their interpretation of § 14(e) was entitled to deferential review and should be confirmed since it was made in good faith and was not unreasonable.

The Hodson III appellees and cross-appellants also claim:

—The court erred in limiting the income interest under § 14(e) to $25,000 per year regardless of the number of beneficiaries receiving that income.

The Minors are cross-appellants with respect to the construction of § 14(e)–(f) of the Trust. They urge:

—The court erred in not construing § 14(f) of the Hodson Trust to mean that one-half of the income referred

---

5. They are: Doris Sherwood Berg Hewes, Charles Chase Hewes, Thomas Hewes, II, William Michael Hewes, Joseph Ellicott Hewes, Jane Ann Berg Griffith, Sandra Griffith Hoffman, John Chadwick Griffith, Jr., Ann William Griffith, Joan King Berg Mullen, Thomas David Mullen, Jr., Tracy Gibbs Mullen, Joan Hodson Mullen, Nancy Hodson Berg Clark, Edward Schuyler Clark, Christopher King Clark, Jennifer Joan Clark Power, Doris Sherwood Brown Swann, Judith Yvonne Sherwood Swann, Thomas Leigh Davidson, Jr., Christopher William Davidson, and Anne Carolyn King Davidson Brockenhuus–Schack.

6. This date was agreed upon by counsel for the Trustees, the Colleges and Bette O. Hodson.

to was distributable to the children of Mary King Hodson Brown, *per stirpes* [7] until there is a failure of issue, but instead reverts to the Trust upon the death of each child of Mary King Hodson Brown.[8]

—The court erred in construing § 14(e) of the Hodson Trust to mean that the income referred to therein did not descend to the issue of Thomas Jr., *per stirpes*, until there is failure of his issue, but instead vested in Thomas III absolutely and continues for the life of the Trust in Thomas III's widow and sole legatee, and her successors in interest.

We hold that the trial court erred in its decision regarding § 14(e) and the deference due to the Trustees. We hold that the trial court was correct in its ruling that the corresponding § 14(f) income reverts to the Trust after the death of each of the named children of Mary King Hodson Brown. Because we hold that the Hodson III appellees are not entitled to any income under § 14(e), we need not and will not address the issue of whether the court erred in limiting such income to $25,000 in accordance with § 14(j-1).[9]

---

**7.** Taking *per stirpes* denotes that descendants of a deceased person together take the share which the deceased person would have taken; this is taking by representation. The antithesis of *per stirpes* is "per capita" distribution; in per capita distribution, property is divided into as many equal shares as there are children and surviving descendants of deceased children with each child or descendant of deceased child taking one share in heir's own right. *In re Estate of Edwards,* 203 Cal.App.3d 1366, 250 Cal.Rptr. 779, 782 (1988).

**8.** Pursuant to Rule 8–503(f), appellees/cross-appellants, descendants of Mary King Hodson Brown, adopt by reference this argument. Additionally, the Trustees rephrased this question in the following manner: "Was the decree below correct in ruling that 'the income interest created by Section 14(f) of the Hodson Trust in Alice Hodson Brown Colby, Lillian Gibbs Brown Berg, Donaldine Brown Davidson, and Doris Sherwood Brown Swann, respectively, reverts to the trust upon the death of each of the said persons.'"

**9.** In a similar vein, we find it odd that the descendants of Mary King Hodson Brown failed to raise the § 14(j-1) cap issue as it relates to

## THE CREATION OF THE TRUST AND
## THE CONTROVERSY

The Hodson Trust, which generated in excess of three million dollars in 1988, was executed on February 17, 1920 by Thomas Sherwood Hodson, Sr. Thomas, Sr. had three children: Clarence, Thomas, Jr. and Mary King Hodson Brown. Clarence founded the Beneficial Loan Society in 1914. The Society became the Beneficial Corporation, a publicly traded corporation with the Hodson Trust as the largest single shareholder. Clarence became quite wealthy and used the corporate stock as the source of the Trust corpus. Clarence established the Trust to honor his father, Thomas, Sr., who was technically the settlor. The Trust reflected Clarence's importance by naming himself, his wife and two sons (but not his daughter) as four of the seven Trustees. Moreover, the Trustees were a self-perpetuating group, enabling Clarence, through his family, to exert control over the Trust after his death.

Thomas, Sr. and Clarence were committed to promoting higher education in the State of Maryland; after his father died in 1920, Clarence devoted his efforts toward the founding of a new university to be known as Hodson University. Clarence formally amended the Trust in 1927.[10] The amendments provided, *inter alia*, that if Hodson University was not founded by 1935, the funds were to be distributed to other colleges located in Maryland with which the Hodson family had connections, namely the college cross-appellants. The 1927 amendments also included subsection (n) of § 2; it provided in relevant part:

"2. It is hereby declared that the purposes for which said Trust is settled and established and the general powers of the Trustees thereof, are:

$$* \qquad * \qquad * \qquad * \qquad * \qquad *$$

---

§ 14(f). Even if they had been successful in their appeal, they would still have had to overcome the cap issue.

10. The original Trust provided for amendments by a majority of the Trustees as long as Clarence Hodson was one of the majority.

"(n) To furnish funds (ultimately and principally) for the charitable cause of Education, in perpetuity, by providing for the incorporation of a University in Maryland, with a perpetual charter and to have affiliated schools, institutes or colleges; ..."

The 1927 amendments also included §§ 2(m), 2(m–1) and 2(m–2). Section 2(m) permitted the Trustees to file suit in a court having equity jurisdiction in Baltimore. Sections 2(m–1) and 2(m–2) provided:

"(m–1) The trustees should themselves decide all matters, unless grave doubts of legality arise, for it would be cumbersome and hazardous, if not disastrous, to attempt administration of a Trust estate by frequent petitions to and decrees of Court and would result in transferring mastery of the trust funds from trustees to courts, contrary to the Declaration of Trust.

"(m–2) It is not intended that any court shall generally administer the Trust, or prescribe the acts or duties of the trustees, or interfere with the trustees in the exercise of their discretion in administration of the Trust, in any manner whatsoever, except where doubts arise as to legality or practicability or true interpretation of some one or more provisions in the Declaration of Trust or Amendments thereto, or which may become doubtful or in controversy as to their proper interpretation, and then only if any cestui qui trust shall claim some advantage or interpretation of the trust terms, and if a majority of these trustees are unwilling or fail to interpret same or will not act without the instructions, guidance, or decree of a court of equity jurisdiction, except as to the points in doubt or controversy."

It is these two provisions which the Trustees claim require their interpretations be given deference by the court, absent unreasonable conclusions.

Clarence Hodson died on January 13, 1928. Three children survived him: George died on October 16, 1929; Clarence, Jr. died without issue on May 13, 1944; and Leila Hodson Hynson is still living.

Clarence's brother, Thomas, Jr., died on October 13, 1936. Thomas, Jr. was survived by his son, Thomas III, who died on April 11, 1976, and two daughters, Elizabeth Sherwood Hodson Bennett and Jannas Leas Hodson Harrington. Thomas III was survived by four children.

Clarence's sister, Mary King Hodson Brown, died on April 26, 1965. She was survived by four children, only one of whom is still living, namely, Doris Sherwood Brown Swann. Mary's deceased children were all survived by issue of their own.

Section 14 of the Trust, which became operative on the death of Clarence in 1928, provided for the distribution of the Trust. Sections 14(e) and (f), the two sections at issue, provided:

"14. After December 31, 1940, or upon the death of said Clarence Hodson, whichever shall first occur, disbursements from the increase [according to Trustees, this should be read as "income"] or profits of said Trust estate (not including increasing value of any securities held) after payment of expenses and making provision for losses, may be made, from time to time, as the trustees may deem desirable, as free gifts or grants (and not as property rights), preferably, but not necessarily, by check of the treasurer, countersigned by the chairman or vice-chairman, as follows:

\* \* \* \* \* \*

"(e) Five (5%) per centum thereof to Thomas Sherwood Hodson, Jr., of Maplewood, New Jersey, for life;

"Upon his death, same shall revert to his oldest living lawful son; but if no such son then his other lawful children, per stirpes, and if no such children, then one-half to his widow during her life, while she remains unmarried, and the other half shall revert to Mrs. Mary King Hodson Brown, for life and upon her death shall revert to the said Trust estate during the continuance of said Trust and be thenceforth a part thereof;

"(f) Five (5%) per centum thereof to Thomas Sherwood Hodson, of Crisfield, Maryland, (the setlor) [sic] for life. Upon his death same shall be payable thereafter one-half to his wife Clara Miles Hodson, if she survives him, the other half to go to said Mrs. Mary King Hodson Brown, if living, and upon her death such income shall revert to her lawful children, Alice Hodson Brown, Lillian Brown Berg, Doris Brown and Donaldine Brown, and her other lawful children, if any, per stirpes, during their lives, and upon their respective deaths, if during the continuance of said Trust, shall revert to said Trust estate, and be thenceforth a part thereof[.]"

Section 14(g) further provides for how income will be paid should the Clarence Hodson family line fail. The Clarence Hodson line has not failed.

But the 1927 amendments clearly set out limitations on the distributions to the lines of both Thomas, Jr. and Mary King Hodson Brown. Section 14(j–1) stated in pertinent part:

"It is also hereby expressly provided that the maximum distribution in any calendar year shall not exceed Twenty-five Thousand ($25,000) Dollars, at any time during the duration of the trust, to any one of the following named or designated persons, or to any one of their lawful issue, whether male or female, or to their spouses as widow or widower, viz.: T. Sherwood Hodson, Jr., or his widow (Thomas, Jr.); Mrs. Mary King Hodson Brown, or her daughters, Doris Brown, Donaldine Brown, Mrs. Lillian Brown Berg...."

Upon the death of Thomas III, the Trustees concluded that no further sums were payable to anyone under § 14(e). Rather, they believed that these sums remained with the Trust.

The case was heard on May 9 and June 15–16, 1988. The trial court received testimony of Lelia Hodson Hynson, daughter of Clarence Hodson and granddaughter of the

settlor, and Finn M.W. Caspersen, chairman of the Trustees. Over 100 exhibits were introduced without objection.

On July 11, 1988, the trial court filed a "Memorandum of Reasons for Decision," rejecting the Trustees' contention that their interpretation of the Trust was entitled to deference. The court ruled that § 14(e) of the Trust granted Thomas III an "absolute estate" for the duration of the Trust in the income referred to in that section. Consequently, that money now goes to the widow of Thomas III under his will. Subsequently, on April 4, 1989, the court ruled that § 14(j-1) imposed a cap of $25,000 annually on that income interest. This appeal followed.

## DEFERENCE TO TRUSTEES

The Trustees argue that the trial court erred when it rejected their interpretation of § 14(e). They assert that the standard the court should have used when reviewing their construction was whether it was made in good faith and whether it was reasonable. Since the Trustees complied with both these rules, the court should have deferred to their interpretation. All of the appellees, the Hodson III, the Minors and the Mary King Hodson Brown descendants, oppose this view. They contend that the Trustees have waived their preferential role. The trial court agreed with the appellees. We, however, agree with the Trustees.

The Trustees do not contest the jurisdiction of the court over the Trust under Md. Est. & Trusts Code Ann. § 14–101 (1974), which provides in pertinent part: "A court having equity jurisdiction has general superintending power with respect to trusts." The Trustees do contest the action of the court in failing to give their interpretation of the Trust deference in light of the terms of the Trust.

During the hearing, the trial court candidly stated what it saw as the issue before the court: "[Y]ou look at an ambiguous phrase and if reasonable persons can differ as to what it means, how can you say that an adoption of one of the possible interpretations is unreasonable?" While we

agree with the trial court's statement, especially in the instant case where the Trust was so poorly written and the two constructions are both plausible, we differ with where it takes us. One authority in the area of trusts has said: "To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him." 2 *Scott on Trusts* (2d ed. 1956) § 187 at 1374. Thus, the real question is, "To what extent do these Trustees have the discretion to interpret the Trust?" The sections of the Trust which are of paramount importance in answering this question are §§ 2(m), 2(m–1) and 2(m–2).

—Section 2(m)—

Although there is no language which explicitly sets forth the parameters of the Trustees' discretion to interpret, § 2(m) does provide that if any provision or purpose becomes "obscure, doubtful, [or] conflicting" the Trustees may take appropriate action. This section also allows the Trustees to ask a court "to interpret the facts and conditions which may have arisen ..." to effectuate the intent of the Trust as near as may be.[11] Since the Trustees "may" take action, instead of an imperative "must," it is possible to infer that they may also *not* take action. That is to say that, if the Trustees believe they have correctly construed the Trust in accordance with the intent of the instrument, they may choose not to go to court and await the challenge of a beneficiary. In any event, § 2(m) does not clarify the issue of whether the Trustees have discretion to interpret the Trust. We move to the other sections.

—Section 2(m–1)—

Section 2(m–1) provides:

---

**11.** The exact language is just one example of the many errors in this instrument:

"... to interpret facts and conditions ... to the end that the provisions ... of [the] Trust may best be effectuated specifically if not generally, according to the Equity doctrine of cy pres."

The draftsman must have intended "specifically if not generally" to have been "generally if not specifically."

"The trustees should themselves decide all matters, unless grave doubts of legality arise, for it would be cumbersome and hazardous, if not disastrous, to attempt administration of a Trust estate by frequent petitions to and decrees of Court and would result in transferring mastery of the trust funds from trustees to courts, contrary to the Declaration of Trust."

The Trustees argue that the phrase "decide all matters" gives them discretion to interpret the Trust. On the other hand, the Hodson III appellees contend that the Trustees' discretion only extends to "administration" of the Trust, not to interpretation. We agree with the Trustees. We explain.

The Hodson Trust is not crystal clear regarding the role of the Trustees in interpreting the Trust. Indeed, it is safe to say that much of this Trust is unclear. Nonetheless, we read the language "decide all matters" literally and accord it such meaning. When read this way, the phrase encompasses the Trustees' power to interpret the Trust. Our reading is supported by the word "decide" which is defined as "arriving at a solution that ends uncertainty." *Webster's Ninth New Collegiate Dictionary* (1985) at 330. Interpreting the Trust fits squarely under this definition and is precisely what the Trustees in this case did. They did not act capriciously, but obtained competent legal advice which confirmed their interpretation.

By implication, the Trustees' interpretation of the Trust controls the vast majority of issues. It is only when there are "grave doubts" concerning the legality of an interpretation that the Trustees would be well advised to go to court for confirmation of their interpretation. This, again, is exactly what the Trustees did. The trial court's response was that, once the court was called upon "to interpret", the purpose of § 2(m–1) no longer existed. This is patently incorrect. In effect, the ruling of the trial court penalizes the Trustees for having their interpretation seriously questioned. This is illogical. Rather, the court should determine: (1) the extent of the Trustees' discretion under the

Trust;  (2) if the Trust instrument confers discretion on the Trustees regarding the matter in issue;  and (3) if the court determines there *is* discretion on the matter at bar, the court defers, assuming the Trustees have acted honestly and reasonably.  (Restatement (Second) of Trusts § 187 (1959);  Scott, *supra.*)  Here, the language of § 2(m–1) fulfills both (1) and (2).  "All matters" means the extent of the Trustees' power is unbounded, except when the legality of an issue arises.  The same phrase answers the question of whether this issue of interpretation is covered:  all issues are included in the Trustees' power, so interpretation must be included.  Finally, the court did not ever allude to any illegality in the Trustees' interpretation.  Rather, the court, after ruling that there was no deference due to the Trustees' interpretation, analyzed each section and interpreted the instrument section by section.  Since we read § 2(m–1) as a grant to the Trustees of the power to interpret the Trust, which does not dissipate when the Trustees go to court, we hold that the trial court erred by not deferring to the Trustees' interpretation.

Not only did the trial court err, but the Hodson III contention that the Trustees' power in § 2(m–1) is limited to the administration of the Trust is flawed.  In addition to the literal reading of the phrase "all matters" which supports the Trustees' position, the Trustees were authorized to do more than simply take care of the administration of the Trust.  The Trustees were also authorized to sue or defend, to effectuate the purposes of the Trust and to amend the Trust, albeit with Clarence's approval.

Thus, we hold that § 2(m–1) bestows the power to interpret the Trust to the Trustees.  This, however, is not the end of our inquiry.

—Section 2(m–2)—

Section 2(m–2) acknowledged the general jurisdiction of the equity courts as they relate to Trusts and specified the court may "generally administer," "prescribe the acts or duties of the trustees," and "interfere with the Trustees in the exercise of their discretion" if three facts exist.  First,

doubts must have arisen regarding the "legality or practicability or true interpretation of one or more trust provisions." The Trustees accede to this requirement. They also use it as proof that interpretation is part of "whatever the trustees do as trustees." Next, a beneficiary must claim some advantage. But the rest of § 2(m–2) requires that the "majority of the trustees are unwilling or fail to interpret same or will not act without the instructions ... of a court of equity jurisdiction...." The Trustees claim that this last condition has not been met so the court should not generally administer the Trust, or interfere with the exercise of their discretion. They argue that they were not "unwilling" to act, nor did they "fail" to interpret §§ 14(e) and (f). We agree with the Trustees regarding the third requirement of § 2(m–2). The Trustees "resolved" this situation in 1985, two years before this case commenced. They are in court only because some of the appellees in this case threatened to institute litigation.

Although the Hodson III appellees observe that the Trustees' Complaint prayed for, *inter alia*, "judgment declaring the proper distribution of the income referred to in §§ 14(e) and (f) of the Hodson Trust Agreement," the Trustees first asked for confirmation of their resolution. This prayer was based on their initial belief that they had discretion to make such a resolution which would be the adopted perspective unless it was illegal or dishonest. The Minors clearly understood that the Trustees' threshold position was that the Trust granted them discretion to interpret the Trust, and that the court should overturn the Trustees' determination only if it were unreasonable. The court itself admitted that the language was ambiguous and open to at least two interpretations. Given the dubious state of the Trust instrument, it is in keeping with the language of the Trust to prevent the court from interpreting it unless absolutely necessary.

### —Summary—

The court is not, as the Hodson III appellees suggest, handcuffed when dealing with this petition. Nor are the

Trustees the "sole repository of wisdom on interpretation." They do, however, have more experience with the Hodson Trust than a court and consequently deserve deference. As the Trustees state, the court, when looking to see whether they have acted honestly and reasonably, is in much the same position as a court reviewing the action of an administrative agency or an appellate court using the substantial evidence with due deference to expertise standard.[12]

## THE TRUST

█ The key to interpreting a trust is to discern the intent of the settlor. The trial court stated:

"Very broadly speaking, the general intent of the settlor as seen within the four corners of the trust instrument is to establish a trust estate, to utilize part of the income for educational purposes and part for members of the Hodson family and to distribute the corpus to the Hodson family and for educational purposes."

The court also noted that the extent to which the settlor intended to have the corpus go to the family versus educational purposes could only be determined by looking at the specific distributive provisions.

### —Section 14(e)—

█ We start with an analysis of § 14(e). Section 14 provides for disbursements of "the increase or profits" with

---

**12.** Another fact supporting our holding that the Trustees are the preferred interpreters of this Trust is revealed in the identity of the Trustees. The trustees, as we have previously stated, were a self-perpetuating entity, the majority of whom, at least initially, were members of Clarence's family. We think the Trustees have developed expertise in dealing with the Hodson Trust. The Trustees believed, and we confirm, they had the authority to construe the Trust. As the quotation from *Scott on Trusts, supra,* confirms, once the Trustees' are held to have discretion, the only determination left for the court is whether the Trustees' decision is illegal. If it is illegal, the court must replace that interpretation with its own legal construction of the trust provision. If, however, the court fails to find that the offered interpretation is illegal, as was the case here, the court should defer to the experts, the Trustees in the instant case, which we now do.

subsection (e) distributing five percent of the Trust to Thomas Hodson, Jr., a son of the settlor. Section 14 clearly stated that these disbursements are made as gifts or grants, followed by a parenthetical "and not as property rights." Upon his death, "the same reverts" to the oldest living son. There were alternative provisions in case there was no such son.

### —Absolute Interest—

The Trustees contend that the court erred in its construction of this section as meaning that an absolute interest in the income vested in Thomas III and continued for the life of the Trust in Thomas III's widow and sole distributee, and her successors in interest. The Trustees interpreted § 14(e) to mean that the income referred to in that section reverted to the Trust upon Thomas III's death. The Hodson III appellees, however, contend that § 14(e) created an income interest which did not terminate upon the death of Thomas III.

The Hodson III appellees cite several Maryland cases to support their argument. They cite *Boutelle v. Boutelle*, 231 Md. 69, 188 A.2d 559 (1963), for the proposition that "an interest will not be cut back to a life interest unless the language of the trust clearly so provides." The Hodson III appellees are not quite right. *Boutelle* states, "[I]t is the general rule that an absolute gift is not reduced by subsequent language, in the absence of clear evidence of an intention to do so." *Boutelle*, 231 Md. at 72, 188 A.2d 559 (citations omitted). An absolute gift is a gift which does not depend on other people in order to be made. Section 14, however, did not give Thomas III an absolute gift; it gave him an income interest. As we have already observed, the preface to § 14 stated that disbursements may be made "from time to time, as the trustees may deem desirable, as free gifts or grants (and not as property rights)." Thus, the instant case is not controlled by *Boutelle*.

The Hodson III appellees also cite *Ryan v. Herbert*, 186 Md. 453, 47 A.2d 360 (1946), as being particularly instruc-

tive on the issue in the case at bar. In *Ryan,* the testator created trusts for his children, but provided that, if a child should die during the term of the trust without surviving issue, the income was to be divided equally among the surviving siblings. If a child died during the trust term with issue surviving him or her, then the income "shall go to and become the property of his or her child ... or children." *Ryan,* 186 Md. at 456, 47 A.2d 360. Therein lies the distinction: the income in *Ryan* became the *property* of the surviving children; the income interest in the instant case did not. The Hodson III appellees quote a portion of *Ryan* where the Court stated:

"In the absence of any words saying that the takers after the death of his children would have only life estates, we must concluded [sic] that his intention was to give them absolute estates in the income which they could do with as they pleased. Life estates have sometimes been enlarged by the courts, but we are aware of no case in which an estate absolute by the terms of the gift has been whittled down by judicial construction to become only a life estate."

*Ryan,* 186 Md. at 462, 47 A.2d 360.

According to the Hodson III appellees, this language controls the present case. This is not necessarily so. As already mentioned, the parenthetical language in § 14 expressly eliminated the possibility of characterizing the distribution of income as a property right. Thus, Thomas Hodson, Jr. did not have a life estate in the five percent income. He had an expectation that, if, after the payment of expenses and the incurring of any losses, the Trustees felt benevolent, he would receive the five percent income. Section 14(e) provided that his eldest living son, or Thomas III since he was the only son, had the same expectation, assuming he survived his father, which he did. The rest of § 14(e) is surplusage since Thomas III did, in fact, survive his father. The Hodson III appellees contend that, since the court must strive to give meaning to every word of the Trust, the alternative portions of § 14(e) cannot be surplus-

age. *McIntyre v. Byrne*, 217 Md. 71, 77, 141 A.2d 692 (1958). This is not necessarily so. As the college cross-appellants argue, in the analogous situation of interpreting conflicting statutes, it is recognized that a construction which renders words superfluous or redundant may be applied if such a construction was intended. *See, e.g., Johnson v. Hall*, 283 Md. 644, 654–55, 392 A.2d 1103 (1978); *Police Commissioner of Baltimore City v. Dowling*, 281 Md. 412, 419, 379 A.2d 1007 (1977). We hold that such a construction was intended here. The first sentence of the second paragraph of § 14(e) is that the oldest living son of Thomas, Jr. will receive the "same." The words "but if no such son" preface the rest of § 14(e). The literal meaning is that, if there *is* "such son," the first sentence dictates and the rest of the provision is inoperable.

The Hodson III appellees contend that, if § 14(e) is construed as the Trustees suggest, income would be shifted from the family to the colleges. Such a result, they continue, contravenes the presumption in favor of leaving property to the family. Where there are two equally plausible interpretations of a will or a trust, the Hodson III appellees assert that the court should adopt the one which prefers the family and kindred of the testator to utter strangers. *In re Estate of Glover*, 463 F.2d 1238, 1242 (D.C.Cir.1972).[13] This cuts both ways as the Trustees point out in responding that, if § 14(e) is construed as the Hodson III appellees suggest, then the income could be transferred to total strangers who are completely outside the Hodson family. We hold that the Trustees' interpretation is not only valid, but more likely corresponded to the settlor's interest than that of the Hodson III appellees.

The Hodson Trust does have the family at the heart of

---

**13.** *Glover* also recognizes that determining what the testator, or settlor, had in mind is still perplexing and "[t]here are no hard core rules to follow and disposition of similar cases is not always helpful." *Glover*, 463 F.2d at 1241 (footnotes omitted). We think these two statements are directly on point regarding the instant case.

the distribution of the Trust corpus.[14] This fact lends credence to the Trustees' contention that a basic concern of Thomas, Sr. and Clarence was education and the income would be the primary source; hence, the settlor intended the income from the Trust to go to the colleges. Further, as the Trustees point out, § 16(c), part of the spendthrift clause of the Trust, provided:

"(c) It is further expressly provided that before the trustees shall declare any distribution of money or property to any cestui qui trust named in this declaration of Trust or hereafter designated by the trustees, *no such money or property of any nature whatsoever shall be subject to execution, attachment or garnishment for any debt, tort, default, miscarriage, or other liability of any cestui qui trust hereunder*, at any time during the continuance of this Trust; nor if any cestui qui trust shall become insolvent, or bankrupt, shall any trustee, receiver, assignee, or other representative of creditors, appointed by any court or voluntarily, or otherwise, obtain or have any title or interest in this Trust estate, or any distribution therefrom, but each and every sum which may be, from time to time, distributed to any cestui qui trust from this estate shall be payable to each cestui qui trust direct and personally, *as it is not intended that any cestui qui trust hereunder shall have any vested interest in this Trust estate or its income or in any distribution of the principal or earnings thereof, as a right, but as gifts, if,*

---

**14.** At the termination of the Trust, the family will receive 85 percent of the Trust corpus, while the colleges will only receive 15 percent. The 1927 Amendments provided for the Trust to continue beyond the date originally scheduled for termination, which was December 31, 1989. The current termination date for the Trust is the 20th anniversary after the death of the last survivor of several persons related to the settlor and living at the time the Trust was established, including Lelia Payne Hynson and Doris Sherwood Brown Swann, both of whom are still alive. This language implies that Clarence knew about the Rule Against Perpetuities and did construct the Trust in order to avoid this pitfall. We cannot say as much for his use of the words "increase and profits," "children," "per stirpes" and "revert," among others. *See* further discussion in § 14(f).

*as and when granted, without power of alienation or anticipation or encumbrance of any nature whatsoever,* whether for the cestui qui trust or a member of his or her family, or any one else, for necessaries, or otherwise[.]" (Emphasis added.)

The Hodson III appellees contend that this provision simply prohibited the Trust beneficiaries from being able to assign their interest or to apply it against bankruptcy. The Hodson III appellees further argue that income interest can be devised to Thomas III's beneficiaries, unless the language of the Trust instrument provided otherwise. *Crouch v. Mercantile–Safe Deposit & Trust Co.,* 220 Md. 140, 151, 151 A.2d 757 (1959). *Crouch* also supports their contention that Maryland law favors the early vesting of estates, and is applicable to gifts of income. *Crouch,* 220 Md. at 147, 151 A.2d 757. A vested estate is one in which there is an immediate right of present enjoyment or a present fixed right of future enjoyment. *In re O'Hanlon's Will,* 27 N.Y.S.2d 889, 899 (1941). Whatever interest Thomas Jr. and his eldest surviving son had, it was not a vested estate or one which was even capable of vesting.

Finally, the Hodson appellees address the Trustees' argument that the trial court's interpretation of the Trust was incorrect because it failed to "advert to other provisions of the trust" and "in general, failed to construe section 14(e) in light of the clear provisions, plan and purpose of the Trust as a whole." *See Childs v. Hutson,* 313 Md. 243, 247, 545 A.2d 43 (1988).

Section 2(n), one of the 1927 amendments, authorized the Trustees to fund an incorporation of a university in Maryland with a perpetual charter. Specifically § 2(n) provided:

"To furnish funds (ultimately and principally) for the charitable cause of Education, in perpetuity, by providing for the incorporation of a University in Maryland, with a perpetual charter and to have affiliated schools, institutes or colleges; and to that end it is now deemed best and wisest to set up the Educational uses of the fund directly in the Declaration of Trust and by amendment to provide

definite functioning methods, rather than continue to depend upon verbal understandings which are more liable to misinterpretation."

The Trustees argue that this provision emphasized the importance of education. In contrast, the Hodson III appellees contend that, since § 2(n) was a 1927 amendment, it cannot be offered as evidence of the settlor's intent since Thomas, Sr. was dead and Clarence was actually responsible for the amendments.[15] Although we agree with the Hodson III appellees that the amendments are not evidence of what Thomas intended, it is logical to believe that Thomas, Sr., the settlor, wanted Clarence's wishes to be followed. This was implicit in the provision that Clarence must agree to the amendments. Thus, the 1927 amendments must be read as part of the Trust and the underlying intent of the amendments must be considered.

The Hodson III appellees also urge that § 2(n), which the Trustees cite as further evidence of their ability to interpret the Trust, appeared to deal more with powers than with purpose. We disagree. Section 2 was entitled, "General Purposes and Powers of Trust." Subsection (n) was an extension of these two ideas, not simply the permission granted to the Trustees as the Hodson III appellees believe.

Moreover, we see no merit to the Hodson III theory that, since § 2(a) provided the purpose and the power "to make grants or gifts of money from time to time, to *persons*, associations or corporations, in a spirit of helpfulness, *love*, charity or philanthropy," family members must be included with educational institutions as recipients (emphasis added). Both §§ 2(a) and 2(n) applied to § 14(e). As we have already noted, individuals will receive the majority of the corpus of the Trust.

The trustees and college cross-appellants point out that consideration of §§ 15(a), 14(q) and 16(c) made clear that,

---

**15.** The Hodson III appellees do not dispute the validity of the 1927 amendments. They merely contest their use in ascertaining the intent of the settlor.

upon each beneficiary's death during the life of the Hodson Trust, his or her interest in the income reverts to the Trust. We agree. Section 15(a) mandated that the income "which may be paid to any person as herein provided, so long as he or she may be entitled to the same, shall revert to the Trust estate upon the death of such person...." Section 14(q) provided that, if any section of the Hodson Trust did not indicate a clear disposition upon the death of a beneficiary, then the income shall also revert to the Trust:

"[U]pon the happening of any contingency or event not herein expressly anticipated, whereby any part of the corpus or increment of said Trust estate specifically allocated to certain persons, heirs, or others designated by name or relationship shall be undisposed of, or beneficiaries for any part thereof shall fail and their shares revert to the Trust estate (unless otherwise granted to another in such contingency), then such part of said estate, with all allotted increments thereto, (except any gifts under Part VII to necessitous descendants of Levin Hodson and their spouses, and any undisbursed portion of increment which shall be retained and increase the value of the estate) shall thereupon be added to and shall pass under the grants herein made to the fiduciaries of said University Special Fund...."

Analyzing § 14(e) in conjunction with §§ 15(a) and 14(q), it is clear that upon Thomas III's death the § 14(e) income reverted to the Trust.

The trial court also failed to consider § 16(c) which states that the beneficiaries have no right or power of alienation. Section 16, entitled "Provisions as to Cestuis Qui Trustent," *supra,* clearly stated that it was not intended that any beneficiary have a vested interest in the estate: distributions are gifts only. Under the trial court's interpretation, Thomas III would have the power to alienate his interest in contravention of § 16(c), as well as the other sections mentioned.

Even if it were not a matter of deference, we are further persuaded by the Trustees' argument concerning the set-

tlor's intention to keep the Trust in the family line. As the trial court recognized, the primary interest in the Hodson Trust lies with Clarence's family. Thomas, Jr. had a lesser interest evidenced by the cap of $25,000 on his annual income. According to the trial court's construction, Thomas III received an absolute interest which his widow could theoretically pass on to someone outside the direct line of Hodson descendants. Since such a result was clearly not intended by Thomas Sr., the settlor, we conclude the ruling of the trial court was a less attractive position.

Our conclusion that this outcome was not considered by the settlor is also supported by what were carefully constructed provisions for the spouses of deceased beneficiaries. Only the widows of Thomas Sr. and Clarence were provided for in the event that they remarried; no widow, including these two, had interests that she could transfer. If the trial court's construction were to stand, then Thomas III's widow would have broader rights than any other spouse, a patently illogical result. For this reason, and the others already discussed, we hold that the § 14(e) income reverted to the Trust after Thomas III died in 1976.

### SECTION 14(f)

■ The Minors and the descendants of Mary King Hodson Brown challenge the trial court's construction of § 14(f). In relevant part, § 14(f) provided:

"Upon his [the settlor's] death same shall be payable thereafter one-half to his wife Clara Miles Hodson, if she survives him, the other half to go to said Mrs. Mary King Hodson Brown, if living, and upon her death such income shall revert to her lawful children, Alice Hodson Brown, Lillian Brown Berg, Doris Brown and Donaldine Brown, and her other lawful children, if any, per stirpes, during their lives, and upon their respective deaths, if during the continuance of said Trust, shall revert to said Trust estate, and be thenceforth a part thereof[.]"

The crux of the § 14(f) income issue is whether the beneficiary's share reverted to the Trust after the death of

each of the first generation to take, or continued down the family line to all descendants of Mary King Hodson Brown throughout the duration of the Trust. The trial court, following the interpretation fostered by the Trustees, ruled that the express provision for reversion of the income to the Trust after the death of Mary King Hodson Brown's four named "lawful children" and her other "lawful children, *per stirpes*" meant that each child's share reverted to the Trust after his or her death. The court concluded that the ordinary words "respective deaths" must be "given precedence over an intention derived from an obvious misuse of a technical term [per stirpes]." We agree with the court's ruling.

Cross-appellant Minors and members of the Brown family emphasize the phrase *"per stirpes."* They argue that Clarence, who the Trustees believe was the primary draftsman of the Trust, was a non-practicing lawyer and it was unlikely that he would have used the term *"per stirpes"* in a fashion which was the opposite of its real meaning. But, as most of the parties admit, the Hodson Trust was not a well-drafted document. There are numerous instances where words were improperly used.[16] Even the Hodson III appellees admit that "it ... appears that some provisions may have been drafted without thoughtful consideration of their impact on other provisions." Moreover, *"per stirpes"* need not mean "distribution through successive generations"; *"per stirpes"* is also synonymous with the "root generation" and their issue who take by representation. The Minors also claim that the court's ruling ignored the

---

**16.** Two examples illustrate the poor quality of the drafting of the Trust: (1) § 14(a) provided that upon the death of the last of the issue of Clarence, Jr., "or *upon the failure of such issue of said Clarence, Jr.,*" Clarence, Jr.'s 15 percent goes to Leila for life if she is living and if not, "then to the *surviving lawful issue of* any of *said Clarence, Jr.,* George Hodson and Leila Payne Hodson, *per stirpes,* so long as said trust shall continue" (emphasis added); (2) § 14(c) stated that the distribution of income to Leila Payne Hobson's surviving lawful issue was to be "in equal shares per stirpes." This phrase is an oxymoron since "per capita," which means "share equally," is the antithesis of "per stirpes," which denotes "the taking by representing the ancestor."

settlor's "obvious intent to benefit his family through successive stirpital interests." We disagree.

The Minors also make much of the word "children." In *Phillips v. Heilengenstadt*, 173 Md. 290, 195 A. 394 (1937) the Court stated:

> "The words 'child or children,' in their usual sense, are words of purchase, and not of limitation, and are always so regarded, unless the testator has unmistakenly used them as descriptive of the extent of the estate given, and not to designate the donees. It is only in special and peculiar cases, where such construction *is* necessary to effectuate the manifest intention of the testator that they will be taken as words of limitation and construed to be equivalent to the words 'issue' or 'heirs of the body.' "

*Phillips*, 173 Md. at 293, 195 A. 394. The legal construction of the word is in accordance with the popular meaning. Miller, *Construction of Wills*, (1927) at 234. Further, in the instant case, § 18(f) of the Trust provided: "Issue, heirs, son, child, or children means a child or children lawfully begotten in wedlock." This statement demonstrated the lack of understanding in the different meanings of these words. But, we agree with both the trial court and the Trustees that there is no reason to believe that the word "children" has a meaning other than the one usually associated with it. Consequently, we hold that § 14(f) income reverts to the Trust upon the respective deaths of the named children of Mary King Hodson Brown.

JUDGMENT REVERSED IN PART AND AFFIRMED IN PART. COSTS TO BE PAID BY APPELLANTS/CROSS–APPELLEES.[17]

---

17. We are, in the exercise of our discretion, assessing the costs against the Trustees.