2003 WY 2

McNEILL FAMILY TRUST, Appellant (Defendant/Third Party Plaintiff),

v.

CENTURA BANK, Appellee (Plaintiff),

and

Sandra Dvorscak, Appellee (Defendant),

and

Meinhold, Stawiarski, Shapiro & Codilis, LLP; Lynn M. Janeway, individually; and Hayley Belt, individually, Appellees (Third Party Defendants).

Centura Bank, Appellant (Plaintiff),

v.

McNeill Family Trust, Appellee (Defendant/Third Party Plaintiff).

McNeill Family Trust, Appellant (Defendant/Third Party Plaintiff),

v.

Centura Bank, Appellee (Plaintiff).

Nos. 02–43, 02–44, 02–59.

Supreme Court of Wyoming.

Jan. 8, 2003.

Kate M. Fox of Davis & Cannon, Cheyenne, Wyoming; and Wm. Daniel Elsom and Teresa Elsom of Elsom & Elsom, Lawyers, Cody, Wyoming, Representing McNeill Family Trust.

Gary R. Scott of Hirst & Applegate, P.C., Cheyenne, Wyoming, Representing Centura Bank.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Centura Bank commenced a foreclosure by power of sale proceeding on a first mortgage which was in default with $87,320.82 due. Centura's attorneys apparently intended to cancel or postpone the sale because they had failed to notify a second mortgagee but did not do so. No bank representative attended the sale, and Bob G. McNeill, on behalf of the McNeill Family Trust (McNeill Trust), made the only bid in the amount of $20,000. The district court found the McNeill Trust's bid price so low as to be unconscionable, and that finding, together with Centura's mistakes, justified the exercise of equitable power to set the sale aside. In an effort to return all parties to the positions they held prior to the sale, the district court ordered Centura to pay the McNeill Trust's attorney fees and costs. We reverse both the decision to set aside the original foreclosure sale and the award of attorney fees and remand to the district court.

## ISSUES

[¶ 2] We rephrase the issues as follows:

I. Did the district court err when it found an unconscionably low sale price required the foreclosure sale be set aside?

II. Was the award of attorney fees and costs to the McNeill Trust supported by law?

## FACTS

[¶ 3] On March 27, 1996, the Shoshone First Bank loaned Robert and Sandra Dvorscak $89,625 and took a first mortgage on their Cody residence which had an appraisal value of $119,500. In September of 1996, U.S. Bank, formerly First Bank, made a $30,000 home equity loan to the Dvorscaks and took a second mortgage on the property. The first mortgage was assigned to Centura in March of 1997.

[¶ 4] The Dvorscaks filed a petition for Chapter 7 bankruptcy protection on November 12, 1997, listing the debts on the real property and provided notice to Centura and U.S. Bank. Pursuant to 11 U.S.C. § 362(a), an automatic stay went into effect when the bankruptcy was filed which precluded any creditor from taking legal action against the Dvorscaks or their bankruptcy estate property without first obtaining an order for relief from stay from the federal bankruptcy court. In March of 1998, Centura referred the Dvorscaks' mortgage to the Colorado law firm of Meinhold, Stawiarski, Shapiro & Codilis, LLP (Centura's attorneys) for foreclosure proceedings. Centura's attorneys obtained a title report, which did not reflect U.S. Bank's second mortgage, and began a foreclosure by power of sale proceeding pursuant to Wyo. Stat. Ann. §§ 34–4–101 through 34–4–113 (LexisNexis 2001) by notifying interested parties and publishing the notice of foreclosure in the Powell Tribune. Centura's attorneys did not obtain relief from the bankruptcy stay prior to commencing the foreclosure process. U.S. Bank subsequently advised Centura's attorneys of the second mortgage, and the attorneys apparently intended to cancel or postpone the scheduled foreclosure sale to allow notification of U.S. Bank and a restarting of the process. However, they failed to do so.

[¶ 5] Mr. McNeill, trustee of the McNeill Trust, saw the published foreclosure sale notice and attended the June 24, 1998, sale. The only other person in attendance was Richard Moser, a deputy sheriff who was there to conduct the sale. Mr. McNeill bid $20,000, and Deputy Moser accepted the bid. Either Deputy Moser or the sheriff's office support staff telephoned Centura's law firm

for instructions regarding the appropriate payee of the check. Deputy Moser informed Mr. McNeill that Centura was the appropriate payee. Mr. McNeil went to the bank, obtained a certified check for $20,000 in the name of Centura Bank as the payee, returned it to the sheriff's office, and obtained a certificate of purchase. When Mr. McNeill returned home, his wife advised him an attorney for Centura had left a telephone message. Mr. McNeill returned the telephone call, and the parties discussed the validity of the foreclosure sale as well as the possible exchange of money for Mr. McNeill's surrender of the certificate of purchase. A June 25, 1998, letter from the law firm to Mr. McNeill documented the telephone call and cautioned that litigation could follow if the "erroneous" sale was not resolved.

[¶ 6] Centura's attorneys filed a lawsuit[1] on July 27, 1998, naming Mr. McNeill, the Dvorscaks,[2] the Park County sheriff, and U.S. Bank[3] as defendants and asserting:

> 10. As a result of mistake and the Sheriff's failure to ascertain the status of Centura's bid and inquire into the absence of a Centura representative [at the foreclosure sale]; as a result of lack of notification to [U.S.] Bank of the sale as required to protect its due process rights; and as a result of Centura's mistake in not withdrawing or postponing the sale, the Mortgagors, Centura, and [U.S.] Bank have all been deprived of their rights to obtain reasonable value for the property, to bid in the amounts of their liens, and/or to redeem the amounts of their liens from the sale in order to fully protect their interests.
>
> 11. Because of the sale, Defendant McNeill has received an improper and inequitably huge windfall.

The prayer for relief requested the sale be declared void and of no effect, the $20,000 payment be returned to Mr. McNeill, and a new sale be held. In October of 1998, Centura's attorneys filed a motion to dismiss contending they had just learned the Dvorscaks' Chapter 7 bankruptcy was filed prior to the foreclosure sale and, therefore, the sale was void because it was conducted in violation of the automatic stay. The district court stayed the action pending resolution of these issues by the bankruptcy court. Centura filed a motion for relief from stay in the bankruptcy court asking that the sale in violation of the stay be held void and the stay be lifted to allow Centura's state court action to proceed. The McNeill Trust and Mrs. Dvorscak filed objections. After a hearing, the bankruptcy court granted the motion for relief thereby permitting the state court proceedings to go forward and validating the foreclosure sale because "[t]o hold otherwise would unfairly reward Centura." Centura filed a motion for reconsideration which was denied; however, it did not appeal the bankruptcy court's holding that the automatic stay did not void the sale.

[¶ 7] Thereafter, in the state court action, the sheriff was dismissed, the McNeill Trust was substituted for Mr. McNeill as a defendant, and Centura filed an amended complaint making the same claim—the sale was void for violation of the automatic stay—that had been unsuccessful in the bankruptcy court. Centura's attorneys then filed a motion for judgment on the pleadings requesting that the district court declare the foreclosure sale void for unilateral mistakes, lack of notice to U.S. Bank, unjust enrichment by the McNeill Trust, irregularity of the sale, and unconscionability. The district court converted the motion to one for summary judgment and granted it ordering that all the parties be returned to their presale status. The court also directed Centura to pay the McNeill Trust's attorney fees and costs of $82,458 in order to fully restore the parties to the presale circumstances. The McNeill Trust appealed the summary judgment, and Centura appealed the award of attorney fees.

---

1. The lawsuit was apparently filed without Centura's knowledge or authorization. However, Centura subsequently ratified its attorneys' actions.

2. Mr. Dvorscak never responded in the suit, and Mrs. Dvorscak participated in a very limited manner in the district and bankruptcy court forums. She did not file a notice of appeal.

3. The McNeill Trust purchased U.S. Bank's second mortgage. Like Mr. Dvorscak, U.S. Bank did not participate in the litigation below or file an appeal.

## STANDARD OF REVIEW

[¶ 8] This case presents no factual disputes. Centura admits committing unilateral mistakes that inadvertently led to the foreclosure sale being held as originally scheduled. The district court granted summary judgment to Centura and invoked its equitable power to restore the parties to their preforeclosure sale status.

[¶ 9] This court has long recognized the foreclosure of a mortgage lien to be an equitable action. *Marple v. Wyoming Production Credit Association*, 750 P.2d 1315, 1317 (Wyo.1988); *Baldwin v. McDonald*, 24 Wyo. 108, 156 P. 27, 32 (1916). We have also embraced the concept that, "by adoption of the Wyoming Rules of Civil Procedure[,] 'the distinction between actions at law and suits in equity has been abolished.' W.R.C.P. 2." *Hyatt Brothers, Inc. ex rel. Hyatt v. Hyatt*, 769 P.2d 329, 332 n. 2 (Wyo.1989). As one result of this abolition, we have approved the use of summary judgment in actions which were historically equitable in nature. *Id.*

[¶ 10] The Oklahoma Court of Civil Appeals, addressing a similar circumstance, held:

> The underlying action, being one to foreclose a mortgage lien, is equitable in nature. Ordinarily, in reviewing a case of equitable cognizance a judgment will be sustained on appeal unless it is found to be against the clear weight of the evidence or is contrary to law or established principles of equity. But because this comes to us from an order granting summary judgment the appellate standard of review is *de novo*.

*Abboud v. Abboud*, 2000 OK CIV APP 116, ¶ 4, 14 P.3d 569, ¶ 4 (citations omitted). This court has often expressed the standard of review that summary judgment is proper "when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Paulson v. Andicoechea*, 926 P.2d 955, 957 (Wyo. 1996). We examine the case in the same manner as the district court and treat the motion as if it were originally before us, using the identical materials and information presented to the district court. *Pekas v. Thompson*, 903 P.2d 532, 535 (Wyo.1995). Therefore, we review the district court's order setting aside the foreclosure as a matter of law and *de novo*.

## DISCUSSION

### A. Summary Judgment and the Original Foreclosure Sale Set Aside

[¶ 11] "The public policy underlying the comprehensive framework governing foreclosure sales is a concern for swift, efficient, and final sales." *6 Angels, Inc. v. Stuart–Wright Mortgage, Inc.*, 85 Cal. App.4th 1279, 102 Cal.Rptr.2d 711, 716 (2001). "The obvious advantage of power of sale foreclosure is that it avoids the expense and delay of a judicial proceeding." E. George Rudolph, The Wyoming Law of Mortgages § 4.1 at 63 (1995). Against the backdrop of these policy considerations, Centura claimed that, even though its mistakes were unilateral, the sale should be set aside in equity because: the sale was inadvertently held due to mistakes committed by Centura's attorneys; Centura did not attend the sale and did not notice U.S. Bank, the second mortgagee; the sale price was grossly inadequate; the McNeill Trust tendered a check shortly after the sale, not immediately upon the acceptance of the bid; and the McNeill Trust was unjustly enriched. The McNeill Trust maintained the original foreclosure sale was valid and, therefore, should not have been set aside and it was entitled to rely upon the finality of the foreclosure process.

[¶ 12] This court has not previously addressed whether a foreclosure sale can be set aside because of an inadequate price due to unilateral errors on the part of the mortgagee. In truth, we have very little precedent regarding foreclosure sales, and the precedent we do have suggests a conservative approach with sales being set aside in only very limited circumstances. This view is evident in Justice Blume's opinion in *Delfelder v. Teton Land & Investment Co.*, 46 Wyo. 142, 24 P.2d 702 (1933).

[¶ 13] The facts in *Delfelder* are somewhat complicated, yet they are sufficiently compelling to warrant review. J.A. Delfelder and Evelyn M. Delfelder executed a $225,000 mortgage on all their property to John Hay. In doing so, Mrs. Delfelder legally waived her homestead rights. Shortly afterward,

Mr. Delfelder died, and Mrs. Delfelder was appointed the executrix of his estate. The principal balance of the debt reduced to $70,000, apparently by application of the proceeds from the sale of livestock. Mrs. Delfelder also executed several renewal notes for the debt in the amount of $70,000 though no formal claim was filed on the debt with her as executrix. Mr. Hay assigned the mortgage to American National Bank which commenced foreclosure proceedings under the power of sale provision for the amount due at that time of $79,269. At the June 2, 1924, foreclosure sale, an agent of American National Bank purchased the property for $72,000. In March of 1926, the bank sold the property to Teton Land & Investment Co. In 1931, Teton Land & Investment Co. filed an action against Mrs. Delfelder to recover the premises. Mrs. Delfelder asserted the sale should be set aside and the action dismissed because of a number of alleged irregularities and her homestead exemption. 24 P.2d at 703. Justice Blume's empathy for the widow's condition and efforts to preserve the homestead were apparent:

> We come then to the main question in the case, namely, whether or not the foreclosure of the mortgage was valid without presentation of the claim of the assignee of the mortgage to the executrix of the estate, in view of the fact that the defendant resided on the premises in controversy, and claimed the same, as her homestead under the statute. The point has given us an infinite amount of trouble. We have continually held that the laws relating to a homestead should be liberally construed. And, in view of that fact, we have labored long, and have delayed the decision in this case, with the hope of finding some way to save the homestead for Mrs. Delfelder without doing undue violence to other principles of law and equity involved in the case.

24 P.2d at 705. The court recognized the sale of exempt property is voidable, not void, depending on whether there is nonexempt property which could be liquidated first and other similar considerations. However, in the end, the court determined Mrs. Delfelder was prejudiced by her own actions, not by the mortgagee's failure to file a claim with the estate:

> The homestead could not have been saved ... without the sale of the farm lands. Should blame be fastened on the assignee of the mortgage because the foreclosure was not started sooner? We do not think so.... [W]e find in the case at bar the fact that the defendant herself, as executrix of the estate, at four different times gave, for the purpose of extending the time of payment, renewal notes for the original indebtedness under the mortgage, which operated, if not entirely so, at least almost like an allowance of the claim, even though not based on a formal claim filed with the estate. The first renewal note was given before, the last long after, the time of filing claims against the estate had expired. She was, accordingly, at least equally to blame for not proceeding more promptly in attempting to determine whether or not the homestead could have been saved. Suppose, then, the claim had been filed. By reason of the extension of the notes, the holder of the mortgage was unable to foreclose. Thus, as a result of defendant's own act, taxes accrued, interest accumulated, and the amount ran up to that ultimately found to be due, and the possibility of saving the home became out of the question.... The fact that these extensions were made by the defendant in her capacity as executrix should not, we think, make any difference. We have, in considering this matter, earnestly attempted to find out whether she might not, in some way, have been damaged by the nonfiling of the claim, but have been unsuccessful by reason of the stubborn facts confronting us....

24 P.2d at 711. In short, the court found the renewals delayed the foreclosure proceedings and the debt thereby increased to an amount sufficient to compromise the homestead exemption. Justice Blume wrote:

> The essence of the defense herein is to have a sale under a mortgage set aside. Such a proceeding is one in equity.... And where, as in this case, the sale was not absolutely void, but at most voidable, *it would seem that it should not be set aside unless she was prejudiced or damaged by the failure of the holder of the mortgage to file a claim* ....

24 P.2d at 710–11 (emphasis added). Professor Rudolph, in a discussion of another issue in *Delfelder*, also recognized the court required that the mortgagor be prejudiced by the action of another in order to justify setting aside a foreclosure sale. Rudolph, The Wyoming Law of Mortgages, *supra*, § 4.3 at 67.

[¶ 14] Some sixty-nine years later, *Manion v. Chase Manhattan Mortgage Corporation*, 2002 WY 49, ¶ 7, 43 P.3d 576, ¶ 7 (Wyo. 2002), indicates this court's continued reticence to set aside or vacate a foreclosure sale absent clear prejudice and irregularity of the proceedings even when an inadequate price has been paid:

> Although no Wyoming case has addressed this area of law, the case law and other authorities establish a general rule that "a foreclosure sale free from fraud or irregularity will not be held invalid for inadequacy of the price." *Kantack v. Kreuer*, 280 Minn. 232, 158 N.W.2d 842, 848 (1968); *Giordano v. Stubbs*, 228 Ga. 75, 184 S.E.2d 165, 168–69 (1971); *West Roxbury Co-op. Bank v. Bowser*, 324 Mass. 489, 87 N.E.2d 113, 115 (1949); *Pentad Joint Venture v. First Nat'l Bank of La Grange*, 797 S.W.2d 92, 95–96 (Tex.App. 1990). Stated another way, "The fact that there is some inadequacy in the price at which property was sold is not sufficient ground for setting aside a sale under a power in a mortgage or trust deed where the sale was lawfully made and rightly conducted, with full opportunity for competition in the bidding, and without fraud, partiality, or oppression." 59A C.J.S. *Mortgages* § 680 (1998) (footnote omitted).

This position is substantially consistent with the section in Restatement (Third) of Property: Mortgages entitled "Adequacy of Foreclosure Sale Price":

> (a) A foreclosure sale price obtained pursuant to a foreclosure proceeding that is otherwise regularly conducted in compliance with applicable law does not render the foreclosure defective unless the price is grossly inadequate.
>
> (b) Subsection (a) applies to both power of sale and judicial foreclosure proceedings.

Restatement (Third) of Property: Mortgages § 8.3 at 581 (1997). The comments to this section reflect "close judicial scrutiny of the sale price is more justifiable when the price is being employed to calculate the amount of a deficiency judgment context." *Id.*, § 8.3 cmt. a at 583. In this case, there was no possibility of a deficiency judgment against the Dvorscaks because their liability for any deficiency was discharged due to the bankruptcy action.

[¶ 15] It can be reasonably inferred from the decision letters of April 4, 2000, and October 30, 2001, that the district court relied on both what it considered to be an unconscionably low sale price and Centura's unilateral mistakes to invoke equity to set aside the foreclosure sale and attempt to return the parties to their presale status quo. We disagree that these circumstances justified setting aside the sale.

[¶ 16] As an initial matter, "[o]ne of the basic tenets of equity is that equitable remedies depend upon a showing by the claimant of clean hands." *Fremont Homes, Inc. v. Elmer*, 974 P.2d 952, 959 (Wyo.1999); *see also Dewey v. Wentland*, 2002 WY 2, ¶ 37, 38 P.3d 402, ¶ 37 (Wyo.2002). Centura does not come to this litigation with clean hands. Centura's unilateral errors, and those of its legal representatives, set the stage for this dispute. The mistakes included the failure to: (1) identify and notice all lienholders prior to initiating the foreclosure proceeding; (2) observe the automatic bankruptcy stay; (3) effectively postpone or cancel the foreclosure sale; and (4) attend the foreclosure sale. A mistake by only one of the parties ordinarily does not offer a reason for a remedy for that party unless the mistake was produced by the fraudulent or inequitable conduct of the other party. *Givens v. Fowler*, 984 P.2d 1092, 1096 (Wyo.1999); *Raymond v. Steen*, 882 P.2d 852, 855 (Wyo.1994); 27A Am.Jur.2d *Equity* § 12 (1996). Following these acts of misfeasance, Centura attempted to strong-arm the McNeill Trust into surrendering the certificate of sale and to have the bankruptcy court void the sale despite Centura's own violation of the stay. The latter tactic backfired when the bankruptcy court recognized the disingenuous nature of the request and validated the sale with the following comments:

In the Tenth Circuit, action taken in violation of the automatic stay is void. *Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372–73 (10th Cir.1990). However, the Tenth Circuit Court of Appeals also recognizes that under some circumstances, retroactive relief is permissible. *In re Calder*, 907 F.2d 953, 956 (10th Cir.1990). In *Calder*, the debtor had actively litigated against the creditor, only raising the automatic stay issue when it was to his legal advantage. That court found the debtor's conduct inequitable and refused to void the litigation.

In this case, the original mistake was made by Centura. Litigation ensued. Although it is not evident at what point in the proceedings the automatic stay became an issue, all parties proceeded to conduct themselves as though the automatic stay was not in effect. The court agrees with the debtor that Centura should not profit by its mistake, and that the status quo in the state court should be maintained. Therefore, the court will annul the automatic stay to validate the foreclosure sale. To hold otherwise would unfairly reward Centura and effectively void the actions taken by Judge Hartman in the Wyoming District Court action.

[¶ 17] Yet another mainstay of equitable relief is that equity will not be invoked if an adequate remedy at law exists. *Texaco, Inc. v. State Board of Equalization*, 845 P.2d 398, 402 (Wyo.1993); *Colorado Interstate Gas Company v. Natural Gas Pipeline Company of America*, 842 P.2d 1067, 1072 (Wyo.1992). As one seeking the benefits of equity, Centura must show it had no adequate remedy at law. *BHP Petroleum Company, Inc. v. Okie*, 836 P.2d 873, 876 (Wyo.1992). Neither the parties nor the district court addressed this issue. However, it is obvious Centura could have pursued purchasing the certificate of purchase from the McNeill Trust or the right of redemption from the bankruptcy trustee and sought recoupment of any loss ultimately incurred, if any, through an action against its attorneys for their alleged negligence in processing and supervising the foreclosure sale. It is somewhat ironic to note this matter could have been much more quickly and inexpensively resolved had Centura taken advantage of the $10,000 offer to sell the certificate of purchase that Mr. McNeill made to Centura's attorneys on the day of the original sale.

[¶ 18] Even if we were to assume clean hands and no adequate remedy at law, these circumstances still do not warrant setting aside the foreclosure sale. A four-pronged test used by the Minnesota Court of Appeals is useful to evaluate the merits of setting aside a foreclosure sale:

"(1) A blameless plaintiff fallen into serious error . . ., which promises a disastrous result, wholly unintended by any of the parties to the transaction . . .; (2) absence of negligence of the person seeking relief; (3) defendants with knowledge of the mistake attempting to secure by inequitable conduct an unconscionable advantage of plaintiff and to enrich themselves unjustly at his expense; [and] (4) the ability of the court to restore the status quo as to all of the interests involved." *Peterson v. First Nat'l Bank of Ceylon*, 162 Minn. 369, 379, 203 N.W. 53, 56–57 (1925).

*Pole v. Trudeau*, 516 N.W.2d 217, 221 (Minn. Ct.App.1994).

[¶ 19] In the instant case, Centura, by its own admission, was not a blameless plaintiff, and it is at least questionable whether the ultimate loss, if Centura had purchased the certificate of purchase or redemption rights, would have had a "disastrous effect." This is especially true since Centura had a potential remedy at law to recoup those funds if, in fact, the mistake was the fault of its attorneys. Centura's negligence also prevents meeting the second prong of the test. The third prong requires the McNeill Trust to have had knowledge of the error and the intent to take unfair advantage. Clearly, this was not the case prior to the actual sale date. Mr. McNeill saw the published foreclosure notice and went to the sale. We decline to infer bad faith from Mr. McNeill's attendance at the foreclosure sale and recognition of a bidding opportunity where inexplicably no representative for the mortgagee appeared at the sale.

[¶ 20] The fourth and final prong of the test requires the court to ascertain whether it is actually feasible to return the parties to their presale status. In another Minnesota

case, *TCF Banking & Savings, F.A. v. Loft Homes, Inc.,* 439 N.W.2d 735, 739 (Minn.Ct. App.1989), the Minnesota Court of Appeals provided factors "critical in determining whether a return to the status quo can be achieved: first, reliance to a party's detriment upon the foreclosure, and second, any subsequently acquired rights of a third party."[4] As to the first factor, it is reasonable to infer the McNeill Trust relied on the sale to its detriment by paying U.S. Bank for an assignment of the second mortgage to protect its interest in the property from redemption. Centura characterizes the McNeill Trust's actions as unreasonable given knowledge of its competing claims. However the McNeill Trust was entitled to rely upon the sanctity and finality of the foreclosure process and to protect the interest it purchased in compliance with the statutory procedures. While the district court ordered that the McNeill Trust's sale funds be returned and attorney fees and costs be paid, it denied recoupment of the payment made for the second mortgage assignment. The McNeill Trust could not have been made completely whole without affecting the subsequently acquired rights of a third party, U.S. Bank. Therefore, we conclude the parties cannot be substantially returned to their presale status. Harkening back to the *Manion* case where our discussion began, we note this appeal presents no indication of fraud or other irregularity that, in conjunction with an inadequate sale price, would be sufficient to support setting aside the foreclosure sale. Consequently, we find, as a matter of law, the district court's decision to do so should be reversed.

[¶ 21] We must specifically address, although the district court did not, the remaining three reasons Centura claims the sale should be deemed invalid and set aside—namely, Centura did not attend the sale or notice U.S. Bank, the McNeill Trust did not tender a check immediately upon the acceptance of the bid, and the McNeill Trust was unjustly enriched.

 [¶ 22] We can identify no legal requirement that the mortgagee either attend the sale or provide notice of the sale to a second mortgagee. The "Acceleration; Remedies" clause of the instant mortgage provides in relevant part:

Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument.... If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law....

If Lender invokes the power of sale, Lender shall give notice of intent to foreclose to Borrower and to the person in possession of the Property, if different, in accordance with applicable law. Lender shall give notice of the sale to Borrower.... Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale.

This language does not require that the mortgagee/lender bid or even be present at the foreclosure sale. In fact, the instrument states the mortgagee/lender *may* purchase the property at the sale; therefore, it is reasonable to conclude the mortgagee/lender's participation is wholly discretionary.

[¶ 23] Our "applicable law" governing foreclosure by power of sale is found in §§ 34-4-101 through 34-4-113. The statutes expressly indicate the foreclosure and sale may be accomplished in accordance with either the terms of the mortgage or the statutes themselves. Section 34-4-101. The act augments, rather than limits, the remedies available in mortgage default circumstances. This is relevant because, similar to the mortgage terms, the statutory provisions permit, but do not compel, the mortgagee/lender to attend and/or bid at the foreclosure sale. Section 34-4-108. We find no indication in either the mortgage or the statutes that a

---

4. These are referred to as the *Romkey* factors pursuant to *Romkey v. Saumweber,* 170 Minn. 438, 212 N.W. 816 (1927).

foreclosure sale is invalid if the mortgagee/lender does not attend the sale.

[¶ 24] The mortgage language at issue in this case requires that notice of the alleged default and scheduled foreclosure sale be given in a prescribed manner to the mortgagor/borrower and anyone currently in possession of the property, if it is a different person. Publication of the notice of foreclosure sale is also required. However, no requirement exists to notify other lienholders. Certainly, a foreclosure sale held without notice to other lienholders would not resolve all outstanding encumbrances. "When a junior lienholder is not made a party to a foreclosure, the junior interest is not bound by the foreclosure decree, and the lienholder is entitled to exercise his rights as if the foreclosure had never taken place." *Patel v. Khan*, 970 P.2d 836, 839 (Wyo.1998). However, it does not follow that failure to give notice would cause the sale to be invalid. "Equity will not set aside a sale merely on the ground that the property was encumbered with other mortgage and judgment liens, at least if there appears to be no controversy as to the amount and priority of such liens." 59A C.J.S. *Mortgages* § 679 at 182 (1998). Similarly, the statutory prerequisites to foreclosure in § 34–4–103 [5] do not require notification to other lienholders.

[¶ 25] Centura also alleges the payment by the McNeill Trust was irregular because of a brief delay while the proper payee was determined and Mr. McNeill went to the bank to obtain a certified check. This argument might have some merit had Centura's attorneys taken this opportunity to explain to the sheriff's office, when it called to ascertain the proper payee, that the sale was held in error. However, this did not occur, and, essentially, the check was delivered to the sheriff contemporaneously. Centura cannot demonstrate prejudice from the brief delay and actually participated to the extent it took no corrective action though contact was made regarding the form of the payment check. "Where the terms of sale provide for payment forthwith of the money bid, the bidder may be allowed a reasonable time to produce the amount of his bid." 59A C.J.S. *Mortgages, supra,* § 864 at 436. Centura attempts to place technicalities of form over substance to undo the damage flowing from its own errors and/or those of its representatives.

[¶ 26] We now consider whether the McNeill Trust has been unjustly enriched. "The burden of proving the elements of unjust enrichment is on the party seeking that remedy." *Boyce v. Freeman*, 2002 WY 20, ¶ 9, 39 P.3d 1062, ¶ 9 (Wyo.2002). The elements that must be established are:

"(1) Valuable services were rendered, or materials furnished,

"(2) to the party to be charged,

"(3) which services or materials were accepted, used and enjoyed by the party, and,

"(4) under such circumstances which reasonably notified the party to be charged that the plaintiff, in rendering such services or furnishing such materials, expected to be paid by the party to be charged. Without such payment, the party would be unjustly enriched."

*Id.* at ¶ 12, 39 P.3d 1062, ¶ 12 (quoting *Coones v. Federal Deposit Insurance Corporation*, 894 P.2d 613, 617 (Wyo.1995)).

5.
(a) To entitle any party to give a notice as hereinafter prescribed and to make such foreclosure, it is requisite:

(i) That some default in a condition of such mortgage has occurred by which the power to sell became operative;

(ii) That no suit or proceeding has been instituted at law to recover the debt then remaining secured by such mortgage, or any part thereof, or if any suit or proceeding has been instituted, that the same has been discontinued, or that an execution upon the judgment rendered therein has been returned unsatisfied in whole or in part; and

(iii) That the mortgage containing the power of sale has been duly recorded; and if it has been assigned, that all assignments have been recorded; and

(iv) That written notice of intent to foreclose the mortgage by advertisement and sale has been served upon the record owner, and the person in possession of the mortgaged premises if different than the record owner, by certified mail with return receipt, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of publication of notice of sale. Proof of compliance with this subsection shall be by affidavit.

"[U]njust enrichment claims visualize a situation where a party receives something of value without payment, which was accepted and used so as to unjustly enrich the recipient of the goods or services." *Metz Beverage Company v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 36, 39 P.3d 1051, ¶ 36 (Wyo.2002). The circumstances of this case fail to prove the fourth element of unjust enrichment— "reasonably notified the party to be charged that the plaintiff, in rendering such services or furnishing such materials, expected to be paid" more than the amount bid.

[¶ 27] The McNeill Trust made its $20,000 bid at what was advertised to be a competitive foreclosure sale arranged by Centura and its representatives. Under these circumstances, we cannot find the McNeill Trust was on notice that, if it was successful in obtaining the subject property by competitive bid for a price less than the outstanding mortgage balance, Centura would expect payment for the difference. This suggestion is wholly inconsistent with the normal and reasonable understanding and expectation of a competitive bid sale. The only thing the McNeill Trust should reasonably have been on notice of was that the highest bid would purchase the property. The McNeill Trust did not lose rights or receive heightened responsibilities solely because the price it paid was substantially less than the debt.

[¶ 28] We are not persuaded, pursuant to the particular facts of this case, that this bid should be considered unconscionable, grossly inadequate, or the root of unjust enrichment. As we noted in *Manion:*

[N]ot only did Manion have the right to go to the foreclosure sale and purchase the property to protect his investment, Wyoming law also provides a right of redemption following a foreclosure sale. This right is available to both the person whose real property has been sold as well as a mortgagee such as Manion. Wyo. Stat. Ann. §§ 1–18–103 and –104 (LexisNexis 2001). Generally, "where the right of redemption is not cut off by the sale, the courts are more reluctant to set it aside for inadequacy of price than where the sale bars the right altogether." 59A C.J.S. *Mortgages* § 680.

2002 WY 49, ¶ 8, 43 P.3d 576, ¶ 8. "There is no requirement that foreclosed property be sold for its appraised value, which may or may not reflect the price that could be obtained upon sale of the property." *World Savings and Loan Association v. Amerus Bank,* 317 Ill.App.3d 772, 251 Ill.Dec. 385, 740 N.E.2d 466, 474 (2000). " '[F]air market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 538, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *see also Krohn v. Sweetheart Properties, Ltd.,* 203 Ariz. 205, 52 P.3d 774, 780 (2002).

[¶ 29] Some jurisdictions have adopted arbitrary percentages of fair market value as their benchmark of unconscionability and which could be utilized to support an unjust enrichment claim. For example, New Mexico identifies sale prices of ten percent to forty percent of value as inadequate and sufficient to justify setting aside a sale when combined with other inequitable circumstances. *Crown Life Insurance Company v. Candlewood, Ltd.,* 112 N.M. 633, 818 P.2d 411, 415 n. 2 (1991); *Armstrong v. Csurilla,* 112 N.M. 579, 817 P.2d 1221, 1235 (1991). Delaware uses a fifty percent fair market value test, and it is suggested in the comment to § 8.3 of Restatement (Third) of Property: Mortgages that less than twenty percent of fair market value is widely accepted as "grossly inadequate." *Burge v. Fidelity Bond and Mortgage Company,* 648 A.2d 414, 419 (Del.1994); Restatement (Third) of Property: Mortgages, *supra,* § 8.3 cmt. b at 584. We will not substitute arbitrary limitations for thorough examination of the facts and equities of each case to determine unconscionability or unjust enrichment.

[¶ 30] Pursuant to our analysis, we conclude the district court erred in granting summary judgment to Centura and endeavoring to return the parties to their presale status. We reverse the grant of summary judgment to Centura and remand for entry of summary judgment on the McNeill Trust's motion and dismissal of all other claims and defenses.

**B. Attorney Fees**

[¶ 31] As an integral part of the exercise of equitable discretion, and in an

effort to restore the presale status quo, the district court ordered Centura to pay the McNeill Trust's attorney fees and costs in excess of $80,000. Centura disputed this award as part of its objection to the district court's ruling setting aside the foreclosure sale.

[¶ 32] We recently reviewed the standards for award of attorney fees reiterating that Wyoming subscribes to the American rule. *Alexander v. Meduna,* 2002 WY 83, ¶ 49, 47 P.3d 206, ¶ 49 (Wyo.2002); *Schlesinger v. Woodcock,* 2001 WY 120, ¶ 21, 35 P.3d 1232, ¶ 21 (Wyo.2001); *Cline v. Rocky Mountain, Inc.,* 998 P.2d 946, 949 (Wyo.2000).

Under the American rule, each party is generally responsible for his own attorney fees. However, a prevailing party may be reimbursed for his attorney fees when express statutory or contractual authorization exists for such an award. Moreover, an exception may be applied in the circumstances of fraud and the corollary award of punitive damages. *See Olds v. Hosford,* 354 P.2d 947, 950 (Wyo.1960) (recognizing an exception to the general rule denying recovery of attorney fees and costs in a replevin action where "fraud, malice, oppression or wil[l]ful wrong" can be shown).

*Alexander,* 2002 WY 83, ¶ 49, 47 P.3d 206, ¶ 49 (some citations omitted). The district court's award of attorney fees was not based on a statute or contract, nor did it include a finding of fraud, malice, or willful wrongdoing. Instead, it was an aspect of the court's exercise of equitable discretion and attempted restoration of the parties to their presale status, which action we have reversed. Therefore, we reverse the award of attorney fees to the McNeill Trust and hold all parties responsible for their own fees and costs of litigation consistent with the American rule.

[¶ 33] Reversed and remanded to the district court for issuance of an order consistent with this opinion.