2003 WY 100

**ROCK SPRINGS LAND AND TIMBER, INC., Appellant (Intervenor),**

v.

**Brendan LORE, as Successor Trustee of the Colista Combs Clements Trust, a/k/a The C.C. Clements Trust, Appellee (Plaintiff),**

and

**Kathleen Lore, Brendan Lore and Michaela Lore Klausmeyer, individually, Appellees (Defendants).**

No. 01–158.

Supreme Court of Wyoming.

Aug. 26, 2003.

Rehearing Denied Sept. 30, 2003.

Representing Appellant: Roger C. Fransen of Hickey, Mackey, Evans and Walker, Cheyenne, Wyoming.

Representing Appellees: Walter Urbigkit of Frontier Law Center, Cheyenne, Wyoming.

Before HILL, C.J.; GOLDEN, LEHMAN, and KITE, JJ.; and JEFFREY A. DONNELL, D.J.

KITE, Justice.

[¶ 1] Rock Springs Land and Timber, Inc. (Rock Springs) entered into a purchase agreement with American National Bank (ANB), as trustee (trustee), to purchase property owned by a trust. The agreement required court confirmation of the deal. The trial court declined to confirm the Rock Springs sale and, instead, confirmed a second purchase agreement with a higher price entered into by the trustee almost a year later. This second agreement failed to close. After considerable delay caused by intervening litigation, including an appeal to this Court, the trial court again rejected the Rock Springs agreement concluding that, although at the time it was signed it was a prudent decision by the trustee, the sale was no longer in the trust's best interests in light of the circumstances at the time of the court's decision. The trial court also confirmed the beneficiaries' replacement of ANB as trustee with a beneficiary, Brendan Lore (Brendan), as successor trustee. Rock Springs appeals from both the rejection of its purchase agreement and the appointment of Brendan as trustee. We reverse and remand.

## ISSUES

[¶ 2] Rock Springs presents the following issues for our review:

I. Did the trial court err when it refused to confirm the purchase agreement between Rock Springs Land and Timber, Inc. and American National Bank?

II. Did the trial court err when it approved the designation of Brendan Lore as trustee of the C.C. Clements Trust?

## FACTS

[¶ 3] Colista Combs Clements executed a trust agreement to provide for her financial needs until her death and for the financial needs of her beneficiaries thereafter. The surviving trust beneficiaries were Kathleen Lore (Kathleen), Brendan, and Michaela Lore Klausmeyer, and the principal trust asset was 6,769 acres of ranch property located north/northwest of Douglas in Converse County. The trust agreement directed "[t]he trust shall always be administered free from the active supervision of any court" and also had a "Spendthrift Clause" to preclude the beneficiaries' creditors from making claims on the beneficiaries' trust interests prior to actual receipt by the beneficiaries.

[¶ 4] In June of 1997, in the course of the administration of the trust long after Ms. Clements' death, ANB was appointed as trustee by court order.[1] Thereafter, ANB sought to sell the ranch property in an effort to address the trust's significant liquidity problems resulting from the beneficiaries' income needs which exceeded the income gen-

---

1. The appellees' brief indicates, without record citation, that Ms. Clements died in December of 1986. The date of Ms. Clements' death does not impact the resolution of this appeal but does provide some historical perspective relative to ANB's appointment as trustee.

erated by the trust property. The trust property was a portion of a ranch which had been partitioned in May 1999 pursuant to Wyo. Stat. Ann. § 1–32–108 (LexisNexis 2003) in settlement of other litigation. During the partition proceedings, court-appointed commissioners determined the value of the trust property to be approximately $805,000. In a June 29, 1999, letter to ANB, Kathleen and Brendan indicated they thought a fair valuation of the property was $1,065,000 based on prices of recently sold, neighboring properties.

[¶ 5] Charles Herron, president of Rock Springs, became aware through a third party that the trust property was for sale and, following a tour of the property with Brendan, negotiated a purchase agreement with ANB. This agreement, dated May 23, 2000, provided that Rock Springs would pay $1 million for the property, excluding mineral rights; make a $50,000 earnest money payment when the agreement was signed; and pay the balance in cash or certified funds at closing. The purchase agreement also provided the sale was subject to "confirmation" by the Eighth Judicial District Court and, if for any reason it was not "confirmed and ratified by the appropriate judicial authority," Rock Springs would be entitled to a refund of all earnest money paid and to declare the agreement null and void. The sale was originally scheduled to close "[w]ithin 30 days after June 26, 2000, at such time and place as mutually agreed by the parties."

[¶ 6] ANB sought the beneficiaries' consent to the sale without success. On June 6, 2000, ANB filed a declaratory judgment action naming the beneficiaries as defendants and requesting the court to confirm the sale and authorize ANB to sell the property pursuant to the agreement. Kathleen filed an answer and counterclaim contending (1) the 1983 amendment to the trust entitled her to a greater portion of the proceeds from a sale than the other two beneficiaries would receive, (2) the Rock Springs sale amount was inadequate and not in the best interests of the trust or the beneficiaries, and (3) the court should reject the purchase agreement. In addition, the three beneficiaries jointly filed a separate answer alleging the Rock Springs sale price was inadequate, the sale was not in the trust's or their best interests, and it should be rejected. In December of 2000, the beneficiaries filed a motion requesting a scheduling conference and permission to file supplementary counterclaims. ANB filed a written objection to this motion, and, in April of 2001, the court set a hearing and scheduling conference for May 3, 2001.

[¶ 7] While the litigation was pending, Rock Springs and ANB extended the closing date at least three times. Despite having signed the Rock Springs agreement and seeking court confirmation, ANB continued to offer the ranch property for sale. Ultimately, ANB entered into a second purchase agreement on or about March 19, 2001, with Bruce Reed (Reed agreement) which provided a price of $1,800,000, $1,000 earnest money, and the balance of $1,799,000 to be paid at closing on August 15, 2001. However, the Reed agreement was contingent upon Mr. Reed selling certain coalbed methane leases for $10 million and included conveyance of twenty-five percent of the mineral rights.

[¶ 8] On April 16, 2001, ANB filed a "Motion to Approve Sale of Trust Property" requesting the court to authorize the sale of the trust property under either the Rock Springs agreement or the Reed agreement. Rock Springs filed a motion for leave to intervene as a matter of right pursuant to W.R.C.P. 24(a) or, alternatively, by permission of the court under W.R.C.P. 24(b). Over ANB's and the beneficiaries' objections, the trial court permitted Rock Springs to intervene "only for the limited purpose of determining the issue of whether the court is required as a matter of law to approve the agreement between [ANB] and Rock Springs." The court ordered Rock Springs to file an appropriate complaint and dispositive motions and established a bifurcated process to hear its case and ANB's case separately. On the day of the hearing on ANB's motion, ANB and the beneficiaries entered into a stipulation, supplemented several days later, by which they agreed the court could enter an order approving the Reed agreement and distribute the sale proceeds to satisfy Kathleen's individual claim. The court issued an order rejecting the Rock

Springs agreement "at this time" and authorized ANB to complete the sale with Mr. Reed with the proviso that, if the Reed agreement was not closed by August 31, 2001, the court's approval would terminate. On or about June 20, 2001, the court issued a separate written order denying Rock Springs' motion for summary judgment under W.R.C.P. 52(c). Rock Springs appealed from both orders.

[¶ 9] While the appeal was pending, the Reed sale failed to close, and ANB filed another motion with the trial court requesting approval of the Rock Springs agreement. Rock Springs also moved this Court to remand the matter to the trial court for consideration of ANB's motion. We granted the motion to remand, stayed the pending appeal, and ordered Rock Springs to report the status of the case to this Court within 150 days.

[¶ 10] Before the hearing in the trial court on remand, the beneficiaries gave notice that they had removed ANB as the trustee and had designated Brendan, one of the beneficiaries, as the successor trustee. ANB filed a motion with the trial court requesting resolution of its status as trustee. Rock Springs responded contending Brendan was unqualified under the terms of the trust to act as trustee, Rock Springs was a bona fide purchaser, and ANB was trustee pending designation of a qualified trustee. The trial court held a hearing on all the pending motions on December 20–21, 2001. It determined ANB was no longer the trustee and Brendan had been properly designated as the successor trustee. The trial court also determined (1) at the time ANB signed the Rock Springs agreement, it was a "prudent and sound decision" by ANB as the trustee; (2) the Rock Springs agreement provided the court broad discretion to consider whether the sale was appropriate under the circumstances existing as of the hearing date, and not those present when the contract was signed; and (3) the trustee—Brendan—was not obligated to honor the Rock Springs agreement and was, therefore, relieved of that obligation.

[¶ 11] In compliance with the order on remand, Rock Springs filed a report of the proceedings on remand with this Court and requested a briefing schedule. The beneficiaries filed a motion to dismiss the appeal, arguing Rock Springs failed to appeal from the trial court's order entered after the remand and contending the second order superseded the first and, therefore, the appeal of the first order was moot. The beneficiaries filed a second motion to dismiss because Rock Springs had secured return of the $50,000 earnest money though the funds were placed in escrow with instructions pending this Court's decision. The beneficiaries also filed a motion to allow Brendan to be substituted for ANB as had already occurred in the trial court proceeding on remand. This Court denied the motions to dismiss, ruling it had retained jurisdiction over the appeal while the matter was on remand making a second notice of appeal unnecessary and finding the escrow arrangement was sufficient to preserve the earnest money. In the same order, this Court permitted substitution of the successor trustee consistent with the trial court's order and established a briefing schedule permitting Rock Springs to refile its principal brief.

## STANDARD OF REVIEW

[¶ 12] The issues presented in this appeal require construction of the terms of the trust agreement. This Court has stated, "The rules of construction of a trust agreement are simple. A trust agreement is governed by the plain meaning contained in the four corners of the document." *Hronek v. Saint Joseph's Children's Home*, 866 P.2d 1305, 1307 (Wyo.1994). In keeping with this premise, the following excerpt explains the applicable standard of review:

As a general rule, the interpretation of the language of a trust instrument constitutes a question of law. *Matter of Home-Stake Prod. Co. Deferred Compensation Trust*, 1979 OK 81, ¶ 8, 598 P.2d 1193, 1196. The "appellate court claims for itself plenary independent and non-deferential authority to reexamine a trial court's legal rulings" *de novo. Kluver v. Weatherford Hosp. Auth.*, 1993 OK 85, ¶ 14, 859 P.2d 1081, 1084; *Corr v. Corr*, 2001 OK CIV APP 31, ¶ 11, 21 P.3d 642, 644. The

courts strive to ascertain and effect the intent of the settlor, but parole evidence may not be considered "where there is no ambiguity and the language of a declaration of trust is clear and plainly susceptible of only one construction[:] the plain provisions of the trust instrument ... determine its construction." *Home–Stake Production Co.*, 1979 OK 81, ¶ 8, 598 P.2d at 1196; *Corr*, 2001 OK CIV APP 31, ¶ 11, 21 P.3d at 644.

*Baldwin v. McCoy (Mary Opal E. Reid Living Trust)*, 2002 OK CIV APP 49, ¶ 7, 46 P.3d 188, ¶ 7 (Okla.Civ.App.2002); *see also Jeffs v. Stubbs*, 970 P.2d 1234, 1251 (Utah 1998) (review of a trust instrument is a question of law); *Taliaferro v. Taliaferro*, 269 Kan. 722, 7 P.3d 1241, 1245 (2000) (review of a trust is a question of law).

## DISCUSSION

### A. Rejection of Rock Springs Agreement

[¶ 13]  To address whether the trial court erred by refusing to confirm the Rock Springs purchase agreement, we must ascertain what standard the trial court should have applied by first examining the trust agreement's terms. The trust agreement provided the trust was to be administered without the active supervision of the court[2] and the trustee would be permitted to deal with the trust property as natural persons would deal with their own property including sale thereof.[3] It also provided the trustee could exercise those powers set forth in the Uniform Trustees Powers Act. Though the trust required a concurrence of a majority of trustees for certain matters pertaining to its administration, notably absent is any provision requiring the beneficiaries to approve a

sale of trust property. The provision regarding consent of the majority of the trustees has no application here because, at all times relevant to this appeal, there was only one trustee.

[¶ 14]  The trust's plain language gave ANB authority to sell the ranch property without the beneficiaries' approval. *Hronek*, 866 P.2d at 1307; *see also Parrette v. Hutchison*, 165 Cal.App.3d 157, 211 Cal.Rptr. 313, 315 (1985) (the trust document's language is the centerpiece of interpretation. Words are to be taken in their ordinary and grammatical sense unless a clear intention to the contrary can be ascertained). While a trustee may *sua sponte* seek the beneficiaries' agreement, unless the trust agreement so provides, their consent is not required.

[¶ 15]  In an apparent effort to avoid any question concerning the propriety of the sale, ANB sought the beneficiaries' consent to the sale pursuant to the Rock Springs agreement. Unable to obtain that consent, and probably in an effort to foreclose future challenges to the sale, ANB included a clause in the Rock Springs agreement as follows:

> **APPROVAL BY THE COURT:** This sale is subject to confirmation by the Converse County District Court, Eight[h] Judicial District, Probate No. 39–56 wherein [ANB] was appointed as Trustee of the Colista Combs Clements Trust. If for any reason the sale is not confirmed and ratified by the appropriate judicial authority, [Rock Springs] shall be entitled to receive all earnest money paid to date as a total refund under the Agreement and the right to declare the Agreement null and void and of no further force or effect.

---

2.  Article IX, Section 3 of the trust (emphasis added) provided in pertinent part:
    *The trust shall always be administered free from the active supervision of any court*.... Proceedings to seek instructions or court determinations shall be initiated in the appropriate state court having original jurisdiction of matters relating to the construction and administration of trusts.

3.  Article X, Section 4 of the trust (emphasis added) provided:
    The Trustee may sell, lease, transfer, exchange or otherwise dispose of, or grant options with

respect to, any and all property at any time forming a part of the trust estate, in such a manner, at such time or times, for such other purposes, for such periods of time whether ending before or after the term of the trust, for such consideration and upon such terms, credits and conditions as it deems advisable, and may make and deliver such deeds, leases and other instruments as it considers proper under the circumstances, *and may deal with the trust estate in all other ways in which a natural person could deal with his own property.*

[¶ 16] ANB's and Rock Springs' rights and obligations under the sales agreement were not altered or suspended in any way pending the trustee's efforts to obtain court confirmation of the sale. Both parties were bound by the agreement as any other seller and buyer would be. However, since the Rock Springs agreement was conditioned upon court confirmation, the trustee continued to offer the property for sale and, ultimately, a year later, secured the second agreement—the Reed agreement. While that agreement provided a higher purchase price, it had other less attractive terms including a minimal earnest money deposit, the inclusion of mineral rights, and the condition precedent that the buyer must first sell certain coalbed methane leases for a minimum of $10 million.

[¶ 17] The standard governing the trial court's consideration of the request to confirm the sale should be whether the trustee was acting in a reasonable and prudent manner at the time the agreement was executed, not whether it had obtained the highest price possible at the time the court acted.

> [M]ere inadequacy of price will not justify a court in refusing to confirm a sale, thus depriving the purchaser of the benefit of his bargain, unless the inadequacy is such as amounts to fraud. Where the inadequacy of price is accompanied by substantial irregularity which affects the rights of a party or parties to the proceeding, reviewing courts will sanction the disapproval of a sale. In this case the only reason appellee seeks disapproval of the sale is because more money was offered. *The fact that events subsequent to a sale in good faith result in the trust estate being deprived of a substantial sum of money, does not outweigh the injustice which a denial of confirmation would work upon appellant.*

*Evans v. Hunold,* 393 Ill. 195, 65 N.E.2d 373, 376 (1946) (emphasis added & citations omitted). This concept is reflected more recently in the following excerpt:

> A trustee enjoys the discretion to make decisions regarding the disposition of the trust corpus, provided that he or she acts

prudently. He or she is not obligated to accept the highest offer, if there are advantages to accepting the offer of another bidder. He or she cannot, however, direct benefits to non-beneficiaries at the expense of the beneficiaries.

*Aloha Lumber Corporation v. University of Alaska,* 994 P.2d 991, 1000 (Alaska 1999) (footnote omitted). This standard is also referred to as the prudent investor rule.

Overall trust performance is a factor in evaluating the performance of the trustee. But it is not by itself controlling. "The court's focus in applying the Prudent Investor standard is conduct, not the end result." J. Alan Nelson, *The Prudent Person Rule: A Shield for the Professional Trustee,* 45 Baylor L.Rev. 933, 939 (1993). The American version of the prudent investor rule began with the *Harvard College* case: " 'All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion, and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested.' " Nelson, 45 Baylor L.Rev. at 939 (quoting *Harvard College v. Amory,* 26 Mass. (9 Pick.) 446, 460–461 (1830)). In *Harvard College,* the court recognized that trust assets could never be fully protected from the uncertainties of the market place; thus, the prudent investor standard was necessarily flexible. Nelson, 45 Baylor L.Rev. at 938.

*Johnston v. Cooper,* 81 Wash.App. 79, 913 P.2d 393, 398 (1996). Likewise, Wyo. Stat. Ann. § 4–8–103 (LexisNexis 2001) (repealed 2003) authorized trustees to "perform, without court authorization, every act which a prudent investor would perform for the purposes of the trust."

[¶ 18] In this case, the trial court found ANB's acceptance of the Rock Springs agreement was a prudent decision at the time it was made. Whether such a decision was prudent or not is a question of fact. *Johnston,* 913 P.2d at 398. The beneficiaries

filed no appeal from that finding. Substantial evidence supported the court's finding. In May 1999, when the ranch was partitioned, the trust property was valued at approximately $805,000. In the same time frame, two of the three beneficiaries indicated in a letter they thought a fair valuation of the property was $1,065,000. A year later, Rock Springs offered $1 million and made a $50,000 earnest money payment. The mineral rights were not included, and no real estate commission was involved. Considering the record as a whole, we agree with the trial court that ANB acted prudently and reasonably when it entered into the Rock Springs agreement.

[¶ 19] However, since the Rock Springs agreement required court confirmation, we must determine whether that fact altered or diminished the trustee's authority. In *D'Ottavio v. Union National Bank and Trust Company of Joliet (Estate of Masters)*, 152 Ill.App.3d 907, 105 Ill.Dec. 898, 505 N.E.2d 24, 27 (1987), the court considered the meaning of the phrase "subject to court approval" included in two competing contracts for sale of trust real property, the first contract having been accepted the night before the second and offering a slightly higher purchase price. In *D'Ottavio*, as in the instant case, the trustee inserted the court approval provision even though it was not required by the trust, the will, or any statute. The court held:

> [T]he insertion of the provision "Subject to Court Approval" in the [first] contract amounted to conditional acceptance of the offer to purchase rather than merely making the contract a conditional offer. The trustee-bank then owed [the first purchaser] the duty to use reasonable efforts to obtain court approval of the contract. Having entered into a binding contract with [the first purchaser] subject only to court approval, the trustee should not have entered into a subsequent contract to sell the property to another party. The equitable interest [the second purchaser] acquired under his contract with the trustee was subject to the [first purchaser's] interests under the prior transaction. This follows the general rule that where equities are otherwise equal, the older in point of

time prevails. It is conceded that the trustee, [the realty companies], and [the second purchaser] all had knowledge of the execution of the [first] contract on the day prior to when the agreement embodying the higher offer was ... executed.

*D'Ottavio*, 105 Ill.Dec. 898, 505 N.E.2d at 27 (citation omitted).

[¶ 20] We find this reasoning compelling and conclude that ANB conditionally accepted the Rock Springs agreement and had a duty to use reasonable efforts to secure court approval. The record reveals that, although ANB filed the declaratory judgment action promptly after executing the Rock Springs agreement, over a year passed before the parties obtained a hearing. Ultimately, the trustee joined with the beneficiaries to request approval of the later contract. This placed Rock Springs in the unenviable position of having to intervene in the ongoing litigation, where significant hostility had developed between the beneficiaries and the trustee, in order to protect its rights under the agreement ANB had conditionally accepted. The record indicates the beneficiaries made ANB's pursuit of court approval of the Rock Springs agreement difficult at best. The court eventually found that ANB had made a "prudent and sound decision" when it signed the Rock Springs agreement. On the basis of that finding, we can reasonably infer the trial court would have confirmed the Rock Springs agreement had there not been the delay caused by the beneficiaries' litigious actions.

[¶ 21] Despite finding the Rock Springs agreement was prudent, the trial court apparently concluded it must look beyond that fact and determine whether the sale was, a year later, in the trust's best interest. The beneficiaries argued this was the appropriate test because the Rock Springs agreement had provided for court confirmation and that fact alone warranted the court to undo what the trustee had done if it determined at a later date that a higher price could be obtained. The trial court found the court approval clause conveyed to it broad advisory and even supervisory powers over those matters within the trustee's authority and "re-

quire[d] judicial consideration of the benefit to the trust and the best interest of the Beneficiaries as a matter of the Court's exercise of discretion in decision." We disagree. The trustee's authority was not altered or diminished when the trustee simply asked the court to confirm the sale. The authority granted by the settlor could not be altered by an agreement between the trustee and a third party, essentially a stranger to the trust, to seek the protection of court confirmation of a proposed sale of property. *Marvin F. Hall Trust v. Hall,* 810 S.W.2d 710, 714 (Mo.Ct.App.1991).

[¶ 22] The court's authority to review a trustee's actions is limited to assuring the terms of the trust are met. The Restatement (Second) of Trusts provides:

Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.

Comment:

c. Kinds of discretionary powers. The rule stated in this Section is applicable both to the powers of managing the trust estate conferred upon the trustee either in specific words or otherwise, and also to such powers as may be conferred upon him to determine the disposition of the beneficial interest. Thus, it is applicable not only to powers to lease, sell or mortgage the trust property or to invest trust funds, but also to powers to allocate the beneficial interest among various beneficiaries, to determine the amount necessary for a beneficiary's support, or to terminate the trust.

Restatement (Second) of Trusts § 187 & cmt. c at 402 (1959). Many jurisdictions have applied this rule and have limited review of trustee actions to determining compliance with the trust's terms, not replacing the trustee's judgment with that of the court. " 'To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him.' 2 *Scott on Trusts* (2d ed.1956) § 187 at 1374." *Benadom v. Colby,* 81 Md.App. 222, 567 A.2d 463, 468 (Ct.Spec.App.1989); *see also Templeton v. Peoples National Bank of Washing-*

*ton,* 106 Wash.2d 304, 722 P.2d 63 (1986); *Miller v. First Hawaiian Bank,* 61 Haw. 346, 604 P.2d 39, 42–43 (1979). The trial court's assumption of expansive authority over the trust because a trustee or beneficiary has asked for clarification of a narrow question penalizes the trustee. *Benadom,* 567 A.2d at 469.

This is illogical. Rather, the court should determine: (1) the extent of the Trustees' discretion under the Trust; (2) if the Trust instrument confers discretion on the Trustees regarding the matter in issue; and (3) if the court determines there *is* discretion on the matter at bar, the court defers, assuming the Trustees have acted honestly and reasonably.

*Id.*

Generally, a court of equity, as part of its general supervisory powers over trusts, has the authority to instruct and advise trustees about their powers and duties.

However, there are limits on a court's authority to advise and instruct trustees, the prime limitation being that such instructions should be given only when the trustees have reasonable doubt about their duties.... [*C* ]*ourts should not serve as legal advisers to trustees.* Thus, the purpose of a court's guidance to trustees is to protect the trustees "in those situations where the advice of competent lawyers is not sufficient protection because of doubtful meaning of the trust instrument or uncertainty as to the proper application of the law to the facts." [*First National Bank v.*] *Christopher,* 624 S.W.2d [474,] 481 [ (Mo.App.1981) ].

*Marvin F. Hall Trust,* 810 S.W.2d at 715 (some citations omitted & emphasis added).

[¶ 23] Sound public policy supports giving effect to contracts entered into with trustees in good faith and for adequate consideration. *Goldberg v. Strass,* 11 Wis.2d 410, 105 N.W.2d 553 (1960). Prospective purchasers must be provided the certainty that their contracts will be honored in order for trusts to be able to function effectively. *Id.; Evans,* 393 Ill. 195, 65 N.E.2d 373. Rock Springs argues the policy is almost indistinguishable from that which promotes the in-

tegrity of sheriff's deeds such as was at issue in *Lutz v. Schmillen,* 915 P.2d 599 (Wyo. 1996), *abrogated on other grounds by Vaughn v. State,* 962 P.2d 149, 151 (Wyo. 1998). We recently made reference to a similar policy in the context of foreclosure sales, stating:

> *Manion v. Chase Manhattan Mortgage Corporation,* 2002 WY 49, ¶ 7, 43 P.3d 576, ¶ 7 (Wyo.2002), indicates this court's continued reticence to set aside or vacate a foreclosure sale absent clear prejudice and irregularity of the proceedings even when an inadequate price has been paid....
>
> ....
>
> .... [T]he [purchaser is] entitled to rely upon the sanctity and finality of the foreclosure process and to protect [its] interest....

*McNeill Family Trust v. Centura Bank,* 2003 WY 2, ¶¶ 14–20, 60 P.3d 1277, ¶¶ 14–20 (Wyo.2003).

[¶ 24] The record in this case discloses good reason for such finality. While an appraisal at the time of the original agreement supported the $1 million value, the beneficiaries presented a second appraisal dated a year later with a higher value. The court recognized the second appraisal "had some problems" and relied heavily on anecdotal information the successor trustee provided regarding ranch operations. The evidence also suggested the property's condition was improved after the first agreement was signed which may have increased the property's value, and Rock Springs argued it assisted in making the improvements. These changes in circumstances are typical in matters of real estate and demonstrate why a standard which allows the trustee's actions to be judged by proverbial "twenty/twenty hindsight" is problematic.

[¶ 25] The trial court "also considered the resistance of the Successor trustee and the Beneficiaries" in refusing to confirm the Rock Springs agreement. We believe the court should have been governed by the settlor's intent, not the beneficiaries' preferences, when they were entitled to no more than the trustee's proper exercise of its fiduciary duty. The trust's terms make it clear the settlor intended the trustee to exercise its judgment regarding what was in the trust's best interest without interference by the courts. This trust provided the trustee with authority to deal with trust property as any "natural person" would. While it is understandable a trial court may lean toward allowing the beneficiaries to have input into how the trust assets are managed, as a matter of law, when the court is asked to confirm a trustee's actions, the trust terms must govern, and the actions must be judged, in light of those terms, at the time the action is taken.

[¶ 26] The trial court improperly refused to confirm the Rock Springs agreement for the sole reason evidence existed that the property had a higher value over a year later. Once the trial court determined ANB acted in a prudent manner when it accepted the Rock Springs agreement, it should have confirmed that agreement. Therefore, we reverse and remand to the trial court for entry of an order of confirmation and authorization of the Rock Springs agreement consistent herewith.

## B. Designation of Brendan as Trustee

[¶ 27] In yet another Byzantine twist in this case, after remand to the trial court for the second confirmation hearing, the beneficiaries removed ANB as trustee and purportedly replaced it with their fellow beneficiary, Brendan. Rock Springs argues the replacement of ANB with a beneficiary violated the trust's terms. In response, the beneficiaries contend Rock Springs has no standing to object to the replacement of the trustee and such replacement was proper.

[¶ 28] We must determine whether Rock Springs has standing to raise this issue on appeal. "Standing to sue is jurisdictional in nature and can be considered at any time in the course of litigation." *Spratt v. Security Bank of Buffalo,* 654 P.2d 130, 134 (Wyo.1982). "Standing is a legal concept designed to determine whether a party is sufficiently affected to insure that the court is presented with a justiciable controversy." *Jolley v. State Loan and Investment Board,* 2002 WY 7, ¶ 6, 38 P.3d 1073, ¶ 6 (Wyo.2002).

The doctrine of standing is a jurisprudential rule of jurisdictional magnitude. At its most elementary level, the standing doctrine holds that a decision-making body should refrain from considering issues in which the litigants have little or no interest in vigorously advocating. Accordingly, the doctrine of standing focuses upon whether a litigant is properly situated to assert an issue for judicial or quasi-judicial determination. A litigant is said to have standing when he has a "personal stake in the outcome of the controversy." This personal stake requirement has been described in Wyoming as a "tangible interest" at stake. The tangible interest requirement guarantees that a litigant is sufficiently interested in a case to present a justiciable controversy.

*Schulthess v. Carollo,* 832 P.2d 552, 556–57 (Wyo.1992) (citations omitted); *see also Sinclair Oil Corporation v. Wyoming Public Service Commission,* 2003 WY 22, ¶ 11, 63 P.3d 887, ¶ 11 (Wyo.2003).

[¶ 29] The beneficiaries argue that, because Rock Springs' participation at the trial court level was limited to determining whether the court is required as a matter of law to approve the agreement between the Trustee and Rock Springs, it did not have standing to challenge the trustee's replacement. We do not believe the order granting intervention foreclosed Rock Springs from addressing new issues that arose in the course of the litigation such as the trustee replacement. Neither the trial court nor the beneficiaries took exception to Rock Springs' pleadings which urged the court to disapprove Brendan's appointment, indicating neither considered the order on intervention as preventing the same. However, since standing is jurisdictional, the failure of either the trial court or the beneficiaries to challenge Rock Springs' standing below does not foreclose the beneficiaries from raising that issue here.

[¶ 30] The contract right Rock Springs seeks to enforce would, under our standing jurisprudence, constitute a "legally protectable interest," thus satisfying the requirement of a personal stake in the outcome of the controversy. However, under the common law, as reflected in the Restatement (Second) of Trusts, no one other than the beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust. Restatement (Second) of Trusts § 200 (1959). Further, a person is not a beneficiary of the trust even though he might incidentally benefit from the performance of the trust. Scott on Trusts § 200 at 209 (1987). While a nonbeneficiary such as Rock Springs may not have standing to bring a direct challenge to the trust's administration where the court has properly obtained jurisdiction over a trust matter pursuant to the declaratory judgment statute and the trust's terms are being ignored, a court may take action to enforce the trust even though not called upon by a trustee to do so.

There is ... a modern tendency in the United States for a court that has supervision over the administration of trust estates to enforce the duties of the trustees even though not called upon by the beneficiaries to do so. The notion seems to be, although it is never very explicitly stated, that it is the function of the court to see that the directions of the settlor are carried out, even though no one complains to the court of the failure of the trustee to carry them out; that the court has administrative powers as distinguished from strictly judicial powers; that once the court acquires jurisdiction over the administration of the trust, it is the function of the court to see that the trust is administered in accordance with the direction of the settlor. Thus in a case in Wyoming, the court said, "It was the duty of the court when it learned in any manner that the trustee was violating the terms of the trust to call it to account and to make such order in the premises as justice and equity required, and to see that the trust was faithfully executed." In a case in Wisconsin the court said that the lower court upon being apprised of the continued failure of the executor and trustee, for 12 years, to render any account, should upon its own motion have immediately cited him to render an account. In a case in Massachusetts it was held that the probate court could properly remove an executor in a proceeding brought by a person as a creditor, even though the person in fact was not

a creditor. The court said that a court can properly act sua sponte. In a case in Pennsylvania it was held that the Orphans' Court might on its own volition, although no controversy or litigation is before it, order a trustee to rent a safe-deposit box. The court said that it had plenary powers over the administration of trusts until final distribution.

... The tendency of American courts has been to lay an increasing emphasis on the function of the court in carrying out the wishes of the settlor.

Scott on Trusts, *supra,* § 200.4 at 217–18 (footnotes omitted). In *International Trust Co. v. Preston (Hicks' Estate),* 24 Wyo. 163, 156 P. 1128 (1916), cited by Scott on Trusts, a trustee's investment in foreign securities was found improper when the will required the trustee to invest in only domestic bonds and securities. The trustee argued the court should not act on the claims made because not all the beneficiaries were parties and the surviving annuitant did not object to the foreign investments. This Court stated:

But this is not a civil action, but a proceeding in a trust estate over which the court had jurisdiction, and the trustee was before the court. It was the duty of the court, when it learned in any manner that the trustee was violating the terms of the trust, to call it to account and to make such order in the premises as justice and equity required, and to see *that the trust was faithfully executed.*

*International Trust Co.,* 156 P. at 1132 (emphasis added). This commitment to the protection of the settlor's intent has continued in Wyoming jurisprudence as reflected in the more recent case of *First National Bank and Trust Company of Wyoming v. Brimmer,* 504 P.2d 1367, 1371 (Wyo.1973), wherein we stated:

The clearly expressed intention of the settlor should be zealously guarded by the courts, particularly when the trust instrument reveals a careful and painstaking expression of the use and purposes to which the settlor's financial accumulations shall be devoted. A settlor must have assurance that his solemn arrangements and instructions will not be subject to the whim or suggested expediency of others after his death.

Pursuant to this authority, we hold, once a court has been properly called upon to become involved in trust matters, it has jurisdiction to take such action necessary to assure the settlor's intent is fulfilled.

■ [¶ 31] Article IX, Section 11 of the trust in this case provided:

After the death of Settlor, ... a majority of the beneficiaries ... may at any time and from time to time remove the Trustee and designate one or more replacements by giving thirty days' written notice to such Trustee. No notice of removal hereunder need give to the Trustee being removed any reason, cause or ground for such removal. If any Trustee shall die, resign, become incompetent, or cease to act for any other reason, the person or persons having the power of removal under this paragraph shall also have the power to fill any vacancy in the trusteeship by an instrument in writing executed within thirty days after the vacancy occurs. If any vacancy is not filled within a thirty day period, then any beneficiary or his or her legal guardian or conservator may petition a court of competent jurisdiction, ex parte, to name a successor trustee to fill such vacancy. By making any such designation, such court shall not thereby acquire any jurisdiction over the trust, except to the extent necessary for making such designation. *Any successor trustee or trustees named hereunder shall be a bank or trust company situated in the United States and having trust powers under applicable federal or state law. Any such bank or trust company shall have a combined capital and surplus of at least two million dollars and assets for which the bank or trust company has sole or shared investment responsibility of at least twenty-five million dollars.*

(Emphasis added.) It is obvious the settlor intended to limit the pool of potential successor trustees to banks or trust companies with established minimum assets. The beneficiaries argued, and the trial court apparently agreed, that the restriction with regard to successor trustees was to apply only when

the court was called upon to designate such successor. We do not believe the trust's language can be read in that manner. It specifically states "any successor trustee named hereunder" must be a bank or trust company, not "any successor trustee named hereunder *by the court.*" The reference to successors named "hereunder" is a clear reference to Section 11 of the trust in its entirety which is entitled "Removal and Replacement by Beneficiaries." Where a question of proper trust administration is so patent in a matter otherwise properly before us, we must give effect to the settlor's intent.

[¶ 32] While it may be argued that our willingness to intervene in trust matters on this issue is inconsistent with our previous holding that the trial court should refrain from interfering with the trustee's prudent exercise of its powers, we believe the two rulings are entirely consistent and guided by the same rule; e.g., we must give effect to the settlor's intent. By granting the trustee broad powers to deal with trust property as any other person could, the settlor intended the trustee's judgment should control the decisions regarding trust property, and, when the court was called upon long after the settlor's death to confirm the trustee's actions, the court's only role was to determine whether those actions were reasonable and prudent at the time. Confirmation of those actions would, therefore, give full effect to the settlor's intent. Likewise, the settlor's clear intent with regard to a successor trustee's selection commands that such successor be a bank or trust company, and that intent must be honored.

[¶ 33] We conclude the trial court erred by confirming the beneficiaries' appointment of Brendan as the successor trustee because he did not meet the trustee requirements set out in the trust agreement. In the absence of a qualified replacement, ANB remained as trustee. That is not to say the beneficiaries cannot replace ANB. However, such successor trustee must be

> a *bank* or *trust company* situated in the United States and having trust powers under applicable federal or state law [with] a combined capital and surplus of at least two million dollars and assets for which the

bank or trust company has sole or shared investment responsibility of at least twenty-five million dollars.

## C. Remaining Issues

[¶ 34] As noted above, the beneficiaries filed two motions to dismiss with this Court alleging (1) a second appeal was required to be filed from the trial court order on remand and (2) the matter is moot because the earnest money was paid into an escrow pending this Court's decision on the merits of the appeal. Both were denied, and yet the beneficiaries raise the issues again in their brief. We decline to reconsider our denial of these motions by which we held this Court retained jurisdiction over the appeal while the matter was on remand making a second notice of appeal unnecessary and found the escrow arrangement was sufficient to preserve the earnest money.

[¶ 35] The beneficiaries also contend that Kathleen has an unresolved issue regarding her individual interest in the partitioned ranch property. ANB and the beneficiaries stipulated to a division of the sale proceeds addressing this alleged claim as it pertained to the Reed agreement. That agreement failed, and the matter was not raised before the trial court in relation to the renewed motion to confirm the Rock Springs agreement.

> Our general rule is that we will not consider issues not raised in the court below. *WW Enterprises, Inc. v. City of Cheyenne,* 956 P.2d 353, 356 (Wyo.1998). There are only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered. *Id.; Bredthauer v. TSP,* 864 P.2d 442, 447 (Wyo.1993).

*Cooper v. Town of Pinedale,* 1 P.3d 1197, 1208 (Wyo.2000). The issue of Kathleen's interest does not fall within these exceptions, and we will not consider it further.

[¶ 36] The beneficiaries also argue the trial court suggested in its first refusal to confirm the Rock Springs agreement that Rock Springs was estopped from arguing the agreement should be confirmed because Rock Springs was aware ANB continued to

offer the property for sale after the Rock Springs agreement was executed. However, the Reed agreement failed, and any estoppel argument attendant to it failed as well.

[¶ 37] Finally, the beneficiaries request an award of attorney fees without a clear articulation of the basis for their claim. The American rule, whereby each party is generally responsible for his own attorney fees and costs, applies in this jurisdiction. *McNeill Family Trust,* 2003 WY 2, ¶ 32, 60 P.3d 1277. Consistent with our precedent, we apply the rule to hold all the parties in this matter responsible for their own fees and costs. *Alexander v. Meduna,* 2002 WY 83, ¶ 49, 47 P.3d 206, ¶ 49 (Wyo.2002); *Schlesinger v. Woodcock,* 2001 WY 120, ¶ 21, 35 P.3d 1232, ¶ 21 (Wyo.2001); *Cline v. Rocky Mountain, Inc.,* 998 P.2d 946, 949 (Wyo.2000).

[¶ 38] Reversed and remanded.